HOPPER S. MOTT et al., Respondents and Appellants, v. AMOS F. ENO, Appellant and Respondent.

1. EJECTMENT — NEW YORK CITY — TITLE TO BLOOMINGDALE ROAD (BROADWAY) — L. 1847, CH. 203. Chapter 203 of the Laws of 1847, entitled "An act to lay out a new street in the twelfth ward of the city of New York and to keep open a part of the Bloomingdale road (Broadway) in said city," which after describing by metes and bounds. the strip of land taken, including the Bloomingdale road, an actual, existing and traveled highway, declared the same "for all legal purposes to be one of the streets of the said city in like manner as if the same had been so laid out by the commissioners appointed in and by the act entitled ' An act relative to improvements touching the laying out of streets and roads in the city of New York and for other purposes, passed April 3d, 1807,'" appropriated *eo instanti* the lands described in it and vested the fee thereof in the city of New York, leaving to the owners the right to obtain compensation for such appropriation from the city through proceedings therefor authorized by statute; and where the city thereafter, pursuant to an act of the legislature (L. 1869, ch. 890), providing for the alteration of the lines of the street, abandoned a strip thereof, incorporated it with the adjoining property and assessed the owner thereof for such benefit, an action of ejectment against his successors in title, brought by descendants of the owners of the land taken pursuant to the act of 1847, based upon a claim of title to the fee of the street, will not lie.

2. SUFFICIENCY OF EVIDENCE AS TO ORDER OF CONFIRMATION IN PROCEEDINGS UNDER ACT. Although no order or rule of court confirming the report of commissioners taking lands *in invitum* for street purposes in proceedings consequent upon the act of 1847 was found, the fact that such order was actually made is sufficiently established by proof 1, of an indorsement upon the report signed by the clerk that it was confirmed by the court on a specified date; 2, of a similar indorsement on the assessment ledger of street openings in the office of the commissioner of

public works; 3, of entries to the same effect in records in the bureau of collection of assessments and arrears; 4, of official publications in the city papers to the effect that the order had been confirmed.

*Mott* v. *Eno*, 97 App. Div. 580, reversed.

(Argued March 1, 1905; decided May 2, 1905.)

CROSS-APPEALS from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered November 30, 1904, affirming a judgment entered upon the report of a referee in an action of ejectment.

This action was brought to eject the defendant from a plot of land on the easterly side of Broadway, between 52d and 53d streets in the city of New York; to the possession of which, as owners in fee of an undivided one-half interest therein, the plaintiffs alleged that they were entitled. The defense was that of a denial of the plaintiffs' allegation and of title in the defendant, exclusive of any other right thereto and under which he, and his predecessors in interest, have had possession and occupation of the premises continuously. The trial before a referee resulted in a judgment that the plaintiffs, as to a portion of the plot, were the owners of an undivided one-half interest and were entitled to the possession thereof; subject, however, to easements of light, air and access appurtenant to the defendant's ownership of the adjacent land. As to a portion of the premises described in the complaint, being a narrow strip of land which forms the easterly side of the plot, the judgment was in favor of the defendant. Cross-appeals were taken to the Appellate Division, in the first department. The plaintiffs appealed, because of the denial of an interest to the extent claimed by them and of the easements, to which their ownership was adjudged to be subject; and the defendant appealed, because of any interest having been adjudged to the plaintiffs. The Appellate Division affirmed the judgment by a divided court. Cross-appeals were, again, taken to this court.

The premises, the title to which is in controversy, prior to the widening and straightening of Broadway, under an act passed in 1869, formed part of the Bloomingdale road, or

Broadway, as then laid out. In 1714, the farm, which included the premises in question, was owned by Matthias Hoppe, afterwards called Hopper. Upon his death, his son, John Hopper, succeeded to the ownership. He died in 1779, devising, in six parts, all of the lands to his five children and the children of a deceased son. One of his children, John Hopper, Junior, through an agreement of the devisees partitioning the property, in 1782, acquired title to his one-sixth part, by conveyances of two parcels of land; one upon the easterly side and one upon the westerly side of Bloomingdale road; each being numbered six upon what is known as Bancker's partition map. The premises in question were part of the bed of that road, as it ran through that portion of the Hopper farm, and lay between the two parcels conveyed to Hopper, Junior. He died in 1819, leaving a will; by which he devised his real estate in trust for his three grandchildren, Ann Striker, Winifred Mott and Garrit H. Striker. Ann died in 1860, without issue. Winifred died in 1862, leaving issue, and Garrit died in 1868, also, leaving issue. The plaintiffs claim through Winifred Mott and it is undisputed that, if the premises have remained a part of the Hopper estate, then they are entitled to a one-half interest therein. The defendant derives his title through certain partition proceedings and it is his claim, not only, that title to the premises passed by the allotments in partition, but that the plaintiffs' ancestors had been, in fact, divested of any interest therein by force of certain statutory proceedings relating to the laying out, or widening, of Bloomingdale road, or to the later proceedings for the straightening of Broadway. From the facts, as they are found by the referee, it appears that the Bloomingdale road was laid out in the colonial period of the history of New York and that it extended, in a northwesterly direction, from about the present Broadway and Sixteenth street. In 1751 a colonial act, reciting that the road through the Bloomingdale district had been laid out to a width of four rods in pursuance of an act of 1703, authorized it to be reduced to two rods. At some date prior to 1819 the road

had been actually widened from two rods to four rods, according to Randel's map filed in that year. In the years from 1791 to 1797, various proceedings were taken by the common council of the city to extend the road to the Kingsbridge road and to restore it to its earlier width of four rods; the authority for which is to be found in an act of the state legislature, passed in 1787, (Chap. 61), and entitled "An Act for the better regulating the Public Roads in the City and County of New York." By its provisions the mayor, aldermen and commonalty of the city of New York were "appointed commissioners to regulate and keep in repair the present public roads or highways; and to lay out, regulate and keep in repair such other public roads or highways, as shall hereafter be laid out in the said City and County." The act authorized them "to widen or alter all public roads and highways, already laid out in the said city and county, to such convenient breadth, not exceeding four rods, nor less than two rods, as the said commissioners shall judge fit, to make them passable for horses and carriages. * * * If, in widening or altering any such public road or highway now in being, or if in laying out any such public road or highway hereafter, or in widening or altering the same, the said commissioners shall take or require for such purposes the lands of any person or persons, they shall give notice thereof to the owners or proprietors of such land, etc. * * * And to the end that reasonable satisfaction may be made for all such lands as shall be taken and employed for the use aforesaid, the said commissioners shall and may treat and agree with the owners and persons interested therein, * * * and if any such owners or proprietors shall refuse to treat in manner aforesaid, then, and in such case, it shall and may be lawful to and for the mayor, or recorder, and any two or more aldermen, by virtue of this act, to issue a precept," etc. Here follows the provision for condemnation proceedings in the Mayor's Court; wherein a jury was to assess the damages "to be awarded to the owner or owners of such land, according to their several and respective interests and estates of and in such land, or any

part thereof, for their respective interests and estates in the same." The judgment of the said Mayor's Court, and the payment of the money awarded to the owners, or tender and refusal thereof, should be binding against the said owners and should be a " full authority to the said commissioners to cause the said land to be converted to and used for the purposes aforesaid."

In 1793, the common council ordered "that the said Road, from its commencement at Horne's house to Nicholas de Peyster's barn be immediately opened to its proper and legal width of four rods." These were points to the south and to the north, respectively, of the premises. In 1797, a petition was presented to the common council praying for the opening of Bloomingdale road to its proper width of four rods and the appointment of a committee of three aldermen was ordered, " to direct the proprietors of the land, where the road is not of the proper width, to remove their fences and then to direct the roadmaster to work and put the road in order." That it was actually so widened at some time prior to 1819 is not disputed. By chapter 115 of the Laws of 1807, commissioners were appointed by the legislature to lay out streets, roads and public squares. Maps and surveys were to be filed. Whenever the mayor, etc., should desire to open any street, road, or public place, they might agree with the owners of the lands required, as to the compensation to be made therefor, or, in case of disagreement, they might apply to the Supreme Court for commissioners to estimate the damage. Upon the assessment being confirmed and paid, the mayor, etc., should be seized in fee of all said lands, in trust, nevertheless, to keep the same open for a public street, road or public square, forever. In 1813, (Chap. 86 of Revised Laws of that year), was passed the familiar " Street Opening Act ; " whose provisions need not now be particularly mentioned, otherwise than that the act of 1807 is referred to and was not repealed. In 1847, an act was passed, (Laws of 1847, chap. 203), entitled " An Act to lay out a new street in the Twelfth Ward of the City of New York and to keep open a

part of the Bloomingdale Road in said City." The first section of the act contains a description of the land to be taken, by metes and bounds, which included within its boundaries all of the Bloomingdale road, as it then existed, to the extent of the new street to be laid out. The land described is "declared for all legal purposes to be one of the streets of the said City in like manner as if the same had been so laid out by the commissioners appointed in and by the Act entitled 'An Act relative to improvements, touching the laying out of streets and roads in the City of New York and for other purposes,' passed April 3, 1807." Thereupon, pursuant to a resolution of the common council to open the street, the municipal authorities initiated the proceedings, under the act of 1813, and its amendatory acts, by petition; which set forth that the common council "have deemed it advisable to open the Bloomingdale Road from the Seventh Avenue to the Tenth Avenue, in the Twelfth Ward of the said City, the said Bloomingdale Road being a street in that part of the said City, laid out into streets, avenues, squares and public places by the Commissioners of streets and roads under and by virtue of an Act * * * passed April 3, 1807, (giving the title as just above quoted), by taking for that purpose the lands and premises hereinafter described" etc.; the description given being the same contained in the act of 1847. Commissioners were appointed; who filed a damage map, on which the then Bloomingdale road appeared, and who made a report, to the effect that they had viewed the lands described and that "said Bloomingdale Road is a street in that part of the City of New York, laid out into streets, avenues, etc., by the Commissioners of streets and roads," under the act of 1807. They made awards for 123 parcels of land, which were taken for the purpose of widening, or of straightening, the road. That part of the road, wherein the premises in question lay, was widened by adding thereto irregular strips, taken from the lands upon either side. At the time, Edward Sandford, as trustee under the will of John Hopper, Junior, was vested with the legal title to all of the

real estate of the testator and was a party to the street opening proceedings. He was paid the awards made for the strips of land taken for the widening and his receipt therefor was proved.

In 1863, a suit was instituted by Garrit H. Striker for the partition of the whole farm of John Hopper, Junior, as between him and those having interests therein. The complaint described the farm, which was in the possession of the testator at the time of his death, as consisting of 28 parcels of land, in the present 22d ward of the city of New York; the boundaries of each being given. The parcels which concern the title to the premises are numbered "fourthly" and "seventhly." That numbered "fourthly," on the easterly side of Broadway, between 52d and 53d streets, was described as "Beginning at a corner formed by the intersection of the northerly line of 52d street with the easterly line of Broadway; thence northerly along the said easterly line of Broadway, 177 feet 9 inches to the land of several owners; thence in a southeasterly direction along said land of several owners to the westerly line of Seventh avenue at a point distant 48 feet southerly from the southerly side of 53d street; thence southerly along the westerly line of Seventh avenue aforesaid 152 feet 10 inches to the northerly side of 52d street; thence westerly along the northerly side of 52d street 96 feet 3 inches to the point or place of beginning." The parcel numbered "seventhly" lay on the westerly side of Broadway opposite to the one described and a particular description is unimportant. Upon the description of each parcel there followed this clause: "together with all the right, interest, claim and demand whatsoever, present or prospective, vested or contingent, of the owners of such last mentioned tract, piece or parcel of land, in the streets and avenues adjoining the same, by reason of the beds of such streets, or avenues, or any part thereof, having been taken, pursuant to the statutes in that behalf made and provided, from such owners to form such streets and avenues." The complaint made reference to an earlier partition proceeding in 1820, in the Mayor's Court, which resulted in an allotment by commissioners to each of

Hopper's three grandchildren, Garrit, Winifred and Ann, of one-third of the real estate, in severalty; but which was subsequently adjudged to have been invalid, by reason of the devisees in Hopper's will having taken under valid trusts for their lives. Ann Striker had died before this last partition suit and, when judgment was entered, Winifred Mott had died. The judgment appointed commissioners for the actual partition and, in accordance with the prayer of the complaint, decreed, with respect to the allotment of portions to Garrit and to the issue of Winifred, that it should conform to the occupation theretofore had in severalty by them under the prior partition; so that the trustee for Garrit should take the portion theretofore occupied by his *cestui que trust* and the issue of Winifred that occupied by her. From Ann Striker's share, as occupied in severalty by her, were allotted portions to Garrit and to the representatives of Winifred. The commissioners filed a map showing Broadway, as it existed under the opening proceedings of the act of 1847, and their compliance with the decree as to the allotments in partition in the equitable manner it had provided for. There were set off to Garrit Striker Mott, out of what had been Ann Striker's portion of the farm, four lots described as " designated on said map by numbers 79, 80, 81, 82 and together described and bounded as follows : ' beginning at a point in the easterly side of Broadway distant 29 feet and seven inches southwardly from the southerly side of 53d street and running thence southwardly along said easterly side of Broadway 99 feet 10½ inches; thence eastwardly on a line parallel with 53d street 115 feet 6½ inches to the west side of Seventh avenue; thence northwardly along said westerly side of Seventh avenue 77 feet 5 inches to land of several owners; and thence northwestwardly along said lands of several owners 141 feet 6⅞ inches to the said easterly side of Broadway the place of beginning.' " There were set apart, also, to him and to Ruth Ann Mott, among others, seven lots, described as " designated on said said map by the numbers 83 to 89; " which formed the westerly side of Broadway, opposite to lots 79 to 82.

23

Their description by metes and bounds was in similar terms
to that in the deed just quoted from, so far as the boundaries
are made to run upon the "line," or "side," of Broadway,
and it need not be more particularly given.    The report of
the commissioners was confirmed by decree, in 1865, and the
parcels allotted to each party in interest were described therein
in the same language that had been used in the report.
Shortly after the confirmation of the report, Garrit Striker
Mott and Ruth Ann Mott conveyed to Dudley Field, among
others, lots 79 to 82, on the easterly side of Broadway, and
lots 83 to 86, on the westerly side of Broadway.    The part of
the roadway affected by this suit lay between.    The descrip-
tion in the deeds was in the same language, which was used
by the commissioners and in the decree.    The defendant
derives his title to the lots, which adjoined the premises in
question through his father; to whom those on the easterly
side of Broadway had been conveyed by Field and who
acquired those on the westerly side of Broadway through
mesne conveyances from Field.

In 1869, (L. 1869, chap. 890), the legislature passed an act
entitled : "An Act to alter the map or plan of the City of
New York, and to carry the alterations into effect."    It
provided for the widening of Broadway between 34th and
59th streets to the width of 100 feet and it required the com-
missioners of the Central park to lay out that part of Broad-
way, and to locate and to establish the easterly and westerly
lines thereof.    Upon the map, which was filed, in accordance
with the requirements of the act, the new easterly line of
Broadway between 52d and 53d streets was fixed west of the
former westerly line of Broadway, as it had theretofore
existed, and that part of Broadway which lay between the
new easterly line and the former easterly line was closed.    In
the part so closed lay the premises described in this complaint.
Commissioners were appointed in proceedings under the act
and upon the damage map filed by them that part of Broad-
way, which was to be abandoned, was marked as being the
property of the city of New York, in trust etc.; while on

the benefit map it was shown as incorporated in the adjoining property, according to the provisions of the act in that respect. The adjoining land, with which the abandoned part of Broadway was thus incorporated, was assessed for benefit in the sum of about $9,800; which sum the defendant's father paid to the city.

*James A. Deering* and *Ferdinand R. Minrath* for plaintiffs, respondents and appellants. The laying out of the Bloomingdale road of the width of four rods in 1707 under the Colonial Act of 1703, the reduction in the width thereof under the act of 1751 to two rods, and the restoration thereof between 1793 and 1807 to four rods, did not divest the fee title at the time of these several proceedings. The public acquired only an easement. (*Cheney* v. *S. O. & N. Y. R. R. Co.*, 8 App. Div. 620; affd., 158 N. Y. 739; *Paige* v. *S. Ry. Co.*, 77 App. Div. 571; 84 App. Div. 91; 178 N. Y. 102; *Gere* v. *McChesney*, 84 App. Div. 39; *Mortimer* v. *N. Y. E. R. R. Co.*, 25 J. & S. 244; *Kernochan* v. *N. Y. E. R. R. Co.*, 27 J. & S. 561; *Hine* v. *N. Y. E. R. R. Co.*, 54 Hun, 425; *Martin* v. *Waddell*, 16 Pet. 409; *Shively* v. *Bowlby*, 152 U. S. 14; *Holden* v. *Jay*, 17 Wall. 243; *Canal Comrs.* v. *People*, 5 Wend. 445.) The title of John Hopper, Sr., the plaintiffs' ancestor, to the land claimed in this action was conclusively established. (*Cheney* v. *S. O. & N. Y. R. R. Co.*, 8 App. Div. 620; 158 N. Y. 739; *Paige* v. *S. Ry. Co.*, 77 App. Div. 571; 84 App. Div. 91; *Gere* v. *McChesney*, 84 App. Div. 39; *Gidney* v. *Earl*, 12 Wend. 98; *John & Cherry Streets*, 19 Wend. 659; *Willoughby* v. *Jenks*, 20 Wend. 96; *Cortelyou* v. *Van Brundt*, 2 Johns. 357; *Jackson* v. *Hathaway*, 15 Johns. 447; *Adams* v. *S. & W. R. R. Co.*, 11 Barb. 414, 453; *Trustees* v. *A., etc., R. R. Co.*, 3 Hill, 567; *Dunham* v. *Williams*, 37 N. Y. 252; *Barclay* v. *Howell*, 6 Pet. 498; *Haberman* v. *Baker*, 128 N. Y. 253, 259.) John Hopper, Jr., in 1782 acquired title to the fee of the roadway under the will of his father, John Hopper, Sr., upon the division of the Hopper farm as directed by the will. (*Bissell* v. *N. Y. C.*

*R. R. Co.*, 23 N. Y. 64; *Perrin* v. *N. Y. C. R. R. Co.*, 36 N. Y. 120; *Lozier* v. *N. Y. C. R. R. Co.*, 42 Barb. 465; *Matter of Chesterman Estate*, 1 Tuck. 53; *Greer* v. *N. Y. C. R. R. Co.*, 37 Hun, 347; *Matter of Mayor*, 20 App. Div. 404; 155 N. Y. 638; *Paige* v. *S. Ry. Co.*, 77 App. Div. 571; *White* v. *Godfrey*, 97 Mass. 472; *Witter* v. *Harvey*, 1 McCord [S. C.], 87; *Schneider* v. *Jacob*, 86 Ky. 102; *People* v. *Law*, 34 Barb. 494.) The partition of the estate of John Hopper, Jr., in the Mayor's Court in which judgment was entered June 22, 1821, was void, and the parties thereto acquired no interests in severalty to the fee in any part of the land of which John Hopper, Jr., died seized. (*Striker* v. *Mott*, 28 N. Y. 82; *Jordan* v. *Van Epps*, 85 N. Y. 427; *Barnard* v. *Onderdonk*, 98 N. Y. 161; *Masten* v. *Olcott*, 101 N. Y. 157; *Griffin* v. *L. I. R. R. Co.*, 102 N. Y. 449; *Johnson* v. *Ormsby*, 32 Penn. St. 200.) The proceedings taken by the city of New York, under chapter 203, Laws of 1847, to open the Bloomingdale road between Forty-fifth and Seventy-first streets did not affect or divest the title of the heirs of John Hopper, Jr., the then owners of the fee. (*Matter of Rhinelander*, 68 N. Y. 107; *Forster* v. *Scott*, 136 N. Y. 577; *Singer* v. *Mayor, etc.*, 47 App. Div. 42; *Corporation* v. *Mapes*, 6 Johns. Ch. 49; *Matter of Canal Street*, 11 Wend. 154; *Martin* v. *Mayor, etc.*, 1 Hill, 545; *Matter of Parade Ground*, 60 N. Y. 319, 324; Dillon on Mun. Corp. § 470; *Sharp* v. *Speir*, 4 Hill, 76; *Striker* v. *Kelly*, 7 Hill, 9; *Doughty* v. *Hope*, 3 Den. 594; *Cleveland* v. *Boerum*, 27 Barb. 252, 254; *Adams* v. *S. & W. R. Co.*, 10 N. Y. 328; *People* v. *Hurlburt*, 46 N. Y. 110; *Miller* v. *Brown*, 56 N. Y. 383; *Hilton* v. *Bender*, 69 N. Y. 75.) The alleged receipt on December 7, 1849, by Edward Sanford, trustee, under the will, etc., of John Hopper, Jr., of the awards made in the report of the commissioners of estimate for the strips added to the old road by the act of 1847 did not divest the interest or title of the remaindermen under that will, from whom the plaintiffs derive title. (*Embury* v. *Sheldon*, 68 N. Y. 235; *Stevenson* v. *Lesley*, 70 N. Y.

516; *Douglas* v. *Cruger*, 80 N. Y. 15; *Crooke* v. *Kings County*, 97 N. Y. 446; *Chester* v. *Jumel*, 125 N. Y. 237; *Matter of Tienken*, 131 N. Y. 391; *Losey* v. *Stanley*, 147 N. Y. 567; *McPherson* v. *Rollins*, 107 N. Y. 316; *Kirsch* v. *Tozier*, 143 N. Y. 390; *Matter of One Hundred & Tenth Street*, 81 App. Div. 27.) If the proceedings under chapter 203, Laws of 1847, were in all respects regular and had also included the land in the old road, and the effect thereof had been to vest in the city the fee for street purposes, nevertheless the title upon the closing of the road under the act of 1869 reverted to the plaintiffs and the other heirs at law of John Hopper, Jr. (*Locke* v. *F. L. & T. Co.*, 140 N. Y. 135; *Matter of G. El. Ry. Co.*, 38 Hun, 438; *B., etc., R. R. Co.* v. *Mayor, etc.*, 49 Hun, 126; *Kellinger* v. *F. S. S., etc., R. R. Co.*, 50 N. Y. 206; *Story* v. *N. Y. El. R. R. Co.*, 90 N. Y. 122; *Hooker* v. *Turnpike Co.*, 12 Wend. 371; *People* v. *White*, 11 Barb. 26; *Downes* v. *D. & F. Co.*, 75 App. Div. 513; *Harris* v. *Elliott*, 10 Pet. 25; *Coverdale* v. *Charlton*, L. R. [4 Q. B.] 104; *Rolls* v. *Vestry of St. George's*, L. R. [14 Ch. Div.] 785.) The decree of January 10, 1865, confirming the report of the commissioners in the partition suit of Striker v. Mott, did not convey the land in the Bloomingdale road as it then existed. (*Bissell* v. *N. Y. C. R. R. Co.*, 23 N. Y. 64; *Perrin* v. *N. Y. C. R. R. Co.*, 36 N. Y. 120; *Matter of La Due*, 118 N. Y. 220; *Mott* v. *Mott*, 68 N. Y. 246; *Hennessy* v. *Murdock*, 137 N. Y. 317; *Gorham* v. *E. El. Co.*, 80 Hun, 290; *Tinker* v. *M. El. Ry. Co.*, 81 Hun, 591; *Jackson* v. *Hathaway*, 15 Johns. 447; *English* v. *Brennan*, 60 N. Y. 609; *White's Bank* v. *Nichols*, 64 N. Y. 65; *Kings Co. Ins. Co.* v. *Stevens*, 87 N. Y. 287; 101 N. Y. 411.) If the effect of the decree of January 10, 1865, in the partition suit of Mott v. Striker was to vest in Garrit Striker Mott and Ruth Ann Mott the fee of the land in the road to the center thereof abutting upon the lots allotted to them, the fact does not aid the defendant's claim of title. On the contrary, the plaintiffs' title would be to the whole instead of an undivided one-half interest. (*Sher-*

man v. *McKeon*, 38 N. Y. 272; *Whiting* v. *Dewey*, 15 Pick.
428; *Winn* v. *Cabot*, 18 Pick. 553; *Chaplin* v. *Rodes*, 7
Watts, 410.) The deeds from Garrit S. Mott and Ruth Ann
Mott, the plaintiffs' ancestors, dated March 14, 1865, to Dudley
Field did not include the land in the abutting road. (*Sparron*
v. *Kingman*, 1 N. Y. 242; *Sage* v. *Cartwright*, 9 N. Y. 49;
*May* v. *Le Clare*, 11 Wall. 232; *Lambert* v. *Huber*, 22
Misc. Rep. 462; *Mayor, etc.*, v. *Carleton*, 113 N. Y. 284.)
Chapter 890, Laws of 1869, under which the old road was
closed or discontinued between Fifty-second and Fifty-third
streets, and the proceedings had thereunder did not divest or
affect the plaintiffs' fee title to the land in the road. (*Post*
v. *Hazlett*, 36 N. Y. S. R. 219; *Spears* v. *Mayor, etc.*, 87
N. Y. 359; *Cassidy* v. *Mayor, etc.*, 62 Hun, 358; *Pollock*
v. *Morris*, 19 J. & S. 112; *Engelhardt* v. *Brooklyn*, 44
N. Y. S. R. 474; *De Peyster* v. *Mali*, 27 Hun, 440; *Fisher* v
*Mayor, etc.*, 57 N. Y. 344; *Mitchell* v. *White Plains*, 62
Hun, 231; *Matter of City of Yonkers*, 117 N. Y. 564;
*Speir* v. *City of New Utrecht*, 121 N. Y. 420; *Embury* v.
*Conner*, 3 N. Y. 511.) The plaintiff's title is in fee simple
absolute. The defendants have no easements in the closed
road. The old road has been effectually closed, and all ease-
ments, public and private, extinguished by the act of 1869,
supplemented by chapter 1006, Laws of 1895, and by the
abandonment thereof by the defendant. (*Voorhees* v. *U. S.
Bank*, 10 Pet. 449; *Coster* v. *Mayor, etc.*, 43 N. Y. 413;
*Fearing* v. *Irwin*, 55 N. Y. 487; *Jackson* v. *Hathaway*, 15
Johns. 453; *People* v. *Kerr*, 27 N. Y. 196; *Van Amringe*
v. *Barnett*, 8 Bosw. 357; *Williams* v. *N. Y. C. & H. R. R.
R. Co.*, 16 N. Y. 97; *Hooker* v. *Turnpike Co.*, 12 Wend.
371; *Trustees* v. *Auburn R. R. Co.*, 3 Hill, 567; *Pearsall*
v. *Post*, 20 Wend. 131; *Higgins* v. *Reynolds*, 31 N. Y. 151;
*Bloomfield* v. *Calkins*, 62 N. Y. 386; *Hymes* v. *Esty*, 133
N. Y. 345; *Barclay* v. *Howell's Lessee*, 6 Pet. 498.)

*Alton B. Parker, David B. Ogden* and *Edward E.
Sprague* for defendant, appellant and respondent. The evi-

dence in the case shows that prior to the year 1820 the Bloomingdale road had been widened from two rods to four rods or thereabouts. The presumption is that this widening took place under the act of 1787, which was the only act authorizing it. That act provided for the taking of the fee of the land needed for the opening or widening of the roads authorized thereby. (*Dunham* v. *Williams*, 37 N. Y. 251; *Mortimer* v. *N. Y. El. R. R. Co.*, 25 J. & S. 244; *Mott* v. *Clayton*, 9 App. Div. 181; *Blackman* v. *Riley*, 138 N. Y. 318.) The act of 1847 and the proceedings taken thereunder vested the city with the fee of all the lands which were described in that act and which were thereby appropriated for a public street in the city of New York, except so far as the city was already the owner of the fee of any such lands. (*Dunham* v. *Williams*, 37 N. Y. 251; *Blackman* v. *Riley*, 138 N. Y. 318; *Matter of Comrs. of Central Park*, 50 N. Y. 493; *Striker* v. *Kelly*, 7 Hill, 9; *Wiggin* v. *Mayor, etc.*, 9 Paige Ch. 16; *Elmendorf* v. *Mayor, etc.*, 25 Wend. 693; *Dolan* v. *Mayor, etc.*, 62 N. Y. 472; *Astor* v. *Mayor, etc.*, 62 N. Y. 580; *Mayor* v. *City*, 101 N. Y. 284; *Tonawanda* v. *Price*, 171 N. Y. 415.) Whatever may have been the actual legal effect of the proceedings taken in 1847 for the opening of Broadway, the city of New York has been in possession ever since, under those proceedings, claiming that the street had been regularly opened under the act of 1813, and that it was entitled to a fee therein. (*Eldridge* v. *Binghamton*, 120 N. Y. 309.) The actual partition made in pursuance of the judgment entered on the 10th day of January, 1865, in the suit of Garrit H. Striker v. James Striker Mott, operated to partition the interest of the tenants in common in the bed of the Bloomingdale road, as well as in the other property affected by that suit, and to vest in Garrit S. Mott and Ruth Ann Mott in severalty all rights which the Hopper heirs may have had in the road. The deeds from Garrit S. Mott and Ruth Ann Mott, under which the defendant claims, conveyed all the grantor's interests in the road. (*Bissell* v. *N. Y. C. R. R. Co.*, 23 N. Y. 61; *Hennessy* v. *Murdock*,

137 N. Y. 317; *Potter* v. *Boyce,* 176 N. Y. 551; *Holloway* v. *Southmayd,* 139 N. Y. 390; *Muldoon* v. *Deline,* 135 N. Y. 150.) Chapter 890 of the Laws of 1869, relative to the widening of Broadway, between Thirty-fourth and Fifty-ninth streets, was constitutional. By the proceedings under that act it was conclusively adjudicated that the plaintiffs had no interest in the bed of the Bloomingdale road as laid out under the act of 1847. As the result of the proceedings under that act the fee of all that part of Broadway as laid out under the act of 1847, which was not contained within the boundaries of the street established by the act of 1869, became vested in the defendant's ancestor in title if he did not already own it. (*Matter of Mayor, etc.,* 28 App. Div. 143; 157 N. Y. 409; *Astor* v. *Mayor, etc.,* 62 N. Y. 580.)

GRAY, J. The statement of facts has been necessarily long, in order that the situation with respect to Bloomingdale road, as affected by legislation and by legal proceedings in the past, and the nature of the present claim of title to its roadbed, may be better understood. That the case is one of great importance is manifest. It is of interest; because it concerns the principal thoroughfare of the city of New York which has existed, either, as a country road from the time of the Dutch occupation to the beginning of the 18th century, or as the important public highway, which was laid out by commissioners under the Colonial Highway Act of June 19th, 1703. It is attended with some difficulty, by reason of the absence of early records, pertinent to its laying out.

The theory of the plaintiffs, and one which has been sustained in the courts below, is that the title to the fee of the land in Bloomingdale road and in Broadway, as it came to be known, was, originally, in those who were the owners of the land at the time of the laying out of the road under the act of 1703, and that it continued to be in them, and in their successors in interest, down to the closing of the road in 1869 and the abandonment by the city of New York of the land in question as a part of the street.

The objections to the claim of the plaintiffs, upon the facts, seem to resolve themselves into two classes. In the first class are to be found those that rest upon the acts of the legislature of this state, which were passed in 1787 and in 1847; which, either, effected an appropriation of the fee of the land to the city of New York for a public road, or street, or authorized the municipal authorities to acquire, by legal proceedings, the fee for such a purpose. In the second class are the objections that the claim of the plaintiffs, if it existed prior to 1847, was barred, either, by the legal proceedings had under the act passed in that year, in relation to the Bloomingdale road, or as the result of the partition suit, which was instituted in 1863 between the Hopper devisees and their heirs.

I shall assume, as sufficient for the purpose of the discussion, that the status of the Bloomingdale road, as a public highway, was first established in 1707 by a certificate of that date, filed by commissioners appointed for the city by the Colonial Highway Act of 1703. (*Holloway* v. *Southmayd*, 139 N. Y. at p. 399.) The termini of that road, as thus laid out, appear to have been from about where 16th street now is to about the present 114th street. The act of 1703 provided that the highway laid out thereunder should be "forever of the breadth of four rods;" but, in 1751, an act of that year provided that the road should be reduced to two rods in width. In 1787, when the colony had become the State of New York, the legislature passed "An Act for the better regulating the public roads in the City and County of New York." The mayor, aldermen and commonalty of the city of New York were appointed commissioners to alter and widen roads already laid out to the width of four rods, so as "to make them passable for horses and carriages." At that time, John Hopper, Junior, grandson of Matthias Hopper, who, in the beginning of the 18th century, was the owner of the farm, had become, by an agreement of partition between himself and the other heirs of John Hopper, Senior, made in 1782, vested with the title to the lands on either side of Bloomingdale road; between which, as a part of the roadbed, the

premises affected by this suit lay. I shall assume that his title, through the voluntary partition of the property, and under the will of his father, which authorized it, extended to the bed of the road and the question then is whether the act of 1787, or any proceedings taken under it by the city, operated to divest that title. It was held below that it was not divested. The act of 1787, by its language, hereinbefore given, provided that, in widening any public road to the legal width, the commissioners should take the necessary land and that, in the event of failing to agree with the landowners upon a " reasonable satisfaction " therefor, the damages should be assessed by a jury, in condemnation proceedings, according to the respective interests and estates of the owners in the land taken, and that payment thereof should be binding thereafter. The referee finds that Bloomingdale road was actually widened to the width of four rods between 1782 and 1819, but that it does not appear at what time, or by what authority, it was so widened. While that is true, the presumptions from what facts are proved point conclusively to a widening of the road having been effected under the provisions of the act of 1787. The Bancker map of 1782 shows the road to have been two rods wide. The Doughty and Randel maps, filed in the years 1819 and 1820, show that the road was then about four rods in width. We find upon record a resolution of the common council, passed in 1793, ordering the opening of the road to the *legal* width of four rods and appointments of committees to effectuate the purpose were made then, and in later years. We find, in 1795, from the minutes of the common council, that Nicholas De Peyster and others had released the lands necessary for the widening of the road to the municipal corporation, and that, in the cases of two persons, who had refused to release for the purpose, their lands, in proceedings in the Mayor's Court, as authorized by the act, had been condemned by the municipal authorities. These records relate to lands to the northward of the premises in question and other records appear to be lacking to evidence, fully, the proceedings, which the city had taken under

the authority of the act; but, meagre as are the facts, I consider them to warrant a presumption, amounting to a certainty, that Bloomingdale road was widened pursuant to the authority contained in the act of 1787. Whether, however, we may say that the city, legally and duly, acquired the fee of the Hopper land in the road is rendered doubtful by the absence of legal proof. So far as the statute is concerned, it, undoubtedly, conferred the authority to acquire the fee of the land required for the roadway through condemnation proceedings; but that the fee was so acquired from John Hopper, Junior is not proved and, perhaps, is incapable of legal proof. The statute does not, necessarily, appropriate the fee of the land for the purpose of a street and the object in view may have been attained by the city through the acquisition of a public easement. I consider that the presumption is conclusive, upon the facts, that the road was widened to four rods by proceedings under the statute; but I doubt that the presumption is equally conclusive, upon what facts are known, that the fee of the additional land required for the purpose was, in all cases, legally acquired. The general rule is that when the language of the statute will bear a construction which will leave the fee in the landowner, that construction will be preferred. If the title to land in the bed of a highway depends upon presumptions, the general rule seems applicable that only an easement was taken. (Elliott on Roads and Streets, § 227; *United States* v. *Harris*, 1 Sumner's Reports, 21; *Washington Cemetery* v. *P. P. & C. I. R. R. Co.*, 68 N. Y. 591.) The case of *Blackman* v. *Riley*, (138 N. Y. 318), does not settle the matter; because, in that case, the question was with reference to the width of Bloomingdale road in 1809, when the deed there under consideration was made. It was held that there was no evidence upon which to find that the widening to four rods was effected prior to 1820 and, consequently, as the plaintiff had failed to establish the fact that the premises formed a part of the roadbed when the deed was executed, he had failed to prove title thereto. But in *Deering* v. *Reilly*, (167 N. Y. 184) where the title to a part of Bloomingdale road, which was

closed in 1867, was in question, some doubt is thrown upon the nature of the title acquired by the city, under the proceedings for extending the road, which were had between the years 1791 and 1795. The land in question in that action was formerly owned by William Molinor, one of the two persons heretofore mentioned as having been proceeded against by the city authorities in condemnation proceedings, in the Mayor's Court, by reason of their refusal to release their lands. It was observed in the opinion that the effect of the "proceedings to continue and extend Bloomingdale Road over Molinor's lands was to create an easement over them for use by the public as a highway." It is true that it had been stipulated in the case that the city, by its proceedings, "obtained only a right of way over the land taken" and that the observation in the opinion was not necessary to the decision; but, nevertheless, it was based, somewhat, upon a consideration of the proceedings and of the provisions of the act of 1787, as well as suggested by the general rule of construction in cases of the taking of lands for highway purposes. Therefore, while recognizing, at this time, the force of the more elaborate argument that the act of 1787 provided for the taking of the fee of the roadbed, I am not prepared to say that the referee was in error in determining, upon the evidence, that it was not shown that John Hopper, Junior, was divested of the fee in the land constituting the bed of Bloomingdale road. So far as the defense to the claim of the plaintiffs is made to rest upon the divesting of the fee in the land through the operation of the Act of 1787, or through what proceedings may have been had thereunder, I am of the opinion that the evidence affords an insecure ground.

But when we turn to the act of 1847, (Chap. 203, Laws of 1847), the situation becomes clear and it is evident, not only, that that act appropriated the lands described therein for a street, (which included that part of the Bloomingdale road), vesting in the city the fee of all lands required to be taken, but that the result of the proceedings under the act was to determine that the only lands, within the appropriation, for

which compensation should be awarded, were those which were taken from abutting owners and added to the existing road, or street. No claim, nor pretext, appears in those proceedings that the city did not own the old roadway.

The act of 1847 was entitled "An Act to lay out a new street in the 12th ward of the City of New York and to keep open a part of Bloomingdale Road." In its first section is contained a description, *by metes and bounds*, of a large parcel of land, which includes all of the Bloomingdale road, between the 7th and 10th avenues, and the same is "*declared for all legal purposes to be one of the streets of said City*, in like manner as if the same had been laid out by the commissioners, appointed in and by an Act entitled 'An Act relative to improvements, touching the laying out of streets and roads in the City of New York and for other purposes,' passed April 3d, 1807." Its only other section provided for the naming of the street by the common council. Chapter 86 of the Revised Laws of 1813, commonly known as the "Street Opening Act," had provided the methods and procedure for the opening of "any street, avenue, square, or public place" laid out by the commissioners under the act of 1807, whenever the municipal authorities were desirous of doing so. By force of its provisions, the fee of the lands condemned for streets, etc., was to vest in the city, in trust to be held for a public street, etc. The act of 1807 provided for the laying out of the city in streets, avenues, public places, etc., and required compensation to be made to the landowners for the lands taken; upon payment of which, when agreed upon, or as ascertained in legal proceedings, the city should be seized in fee thereof, and the act of 1813 provided for the appropriate procedure in such cases. This latter act and its various amendatory acts have since furnished the legal machinery in all cases of street openings, and it has been held with respect to it that "language could not more plainly indicate the intention of the legislature that every question connected with the estimate and assessment, everything that could in any form be litigated before and passed upon by the commissioners, should

be finally and conclusively determined by the Supreme Court."
(*Matter of Commissioners of Central Park*, 50 N. Y. 493.)

The act of 1847 was imperative in appropriating the lands it
describes for the city street and, necessarily, vested the city
with the fee ; leaving those persons, who had title to the same,
or interests therein, to recover compensation therefor from the
city in ways provided by law. (See *Donnelly* v. *City of
Brooklyn*, 121 N. Y. 9 and *Sage* v. *Same*, 89 ib. at p. 197.)
Words cannot more strongly express the absolute appropri-
ation of land to constitute the proposed street, than do those
of this statute and to hold that its terms are satisfied by the
taking of an easement, in my opinion, would be to accomplish
a great, if not a singular, perversion of its expressed purpose.
The right to appropriate lands for the public use has always
resided in the legislature of the state and the extent of the
appropriation, in the case of a highway, or of a street, whether
of a public easement therein, or of the fee, is to be determined
by the language used and upon a consideration of the need to
be supplied. (*Brooklyn Park Com'rs* v. *Armstrong*, 45 N. Y.
234 ; *Spears* v. *Mayor, etc., of N. Y.*, 87 ib. 359.) This act
was a valid exercise by the state of its right of eminent domain
upon the lands described and the constitutional requirement of
compensation was satisfied, in the existence of a certain, and an
ample, remedy, through resort to which the landowners could
obtain compensation from the city for their damage. If, there-
fore, the Hopper estate had any interest in the land described
in the act, it was appropriated to the city and the estate was
divested thereof. But, further, the decree, which confirmed
the proceedings instituted by the city to lay out the new street
under the act of 1847, in my opinion, operated in either of two
ways. It, either, amounted to an adjudication against the
existence of the title now set up by these plaintiffs ; or, it oper-
ated to bar any claim on the part of those in whom it may have
been and of their successors in interest. The proceedings lead-
ing to the decree were instituted by the city upon a petition to
the Supreme Court, which was expressly based upon the pro-
visions of the Street Opening Act of 1813 and of its various

amendatory acts. It alleged that the common council had
" deemed it advisable for the public convenience to open the
.Bloomingdale road from the Seventh Avenue to the Fourth
Avenue in the Twelfth ward of the said City, *the said
Bloomingdale Road being a street in that part of the said City
laid out etc.* * * *  *by virtue of an Act entitled etc.*—
(here reciting the title of the act of 1807), — by taking for
that purpose the lands and premises hereinafter described,
*  *  *  situated and bounded as follows etc." The
description of the lands is then given in the same terms as in
the act of 1847. Edward Sandford, as trustee under the will
of John Hopper, Jr., was vested with the legal title to whatever
there was of that estate. Commissioners were appointed by
the court, who, in due course, made their report, after hav-
ing given such public notices as were required by the law.
They reported that the Bloomingdale road was a street of
the city, as alleged in the petition, and their maps showed
it, by metes and bounds, as a portion of the land appropriated
by the act; designating it as the " present road." They
awarded damages for 123 parcels of land, which were taken
under the act for the making of the new street from each
side of the Bloomingdale road; the title to two of which
between 52d and 53d streets was in Sandford, as trustee. As
to those two parcels, they reported the fee to be in him and
they assessed the damages for the taking at certain sums; the
trustee's receipts for the payment of which were evidenced
in books produced from the proper municipal custody. As
to the lands, which lay within the boundaries of the Bloom-
ingdale road, the commissioners made no awards for damages
and it is argued for the plaintiffs that, it having been made
by the statute their duty to make awards for all lands taken,
their failure to do so for those in the old road left the title
undisturbed. The argument is, in my opinion, untenable.
The commissioners had to act, in effectuation of the purpose
of the statute, as well upon what they term on their map the
" present road," as a part of the land appropriated, as upon
the rest of the lands, in ascertaining to whom compensation

was to be made for lands taken.    When they reported to the court that damages should be awarded only for the pieces of land taken from abutters upon the old road, it was an inevitable, and a logical, inference that they had determined that, as to those lands only, was the city obligated to make compensation.    It amounted to a finding that the city already owned the rest of the particularly designated tract of land, which the act appropriated for the new street.    It seems to me that it is quite difficult of belief, and it is most unreasonable to assume, that the commissioners confined their determination to those parcels, or strips, taken from the adjoining lots.

The case of *Speir* v. *Town of New Utrecht*, (49 Hun, 294 and 121 N. Y. 420), which counsel refer to, differs, materially, from this case.    In that case, it is true that no awards were made for the land in the old road, but only for lands, which lay outside thereof and within the line of the new avenue, and that it was held, in consequence, that there was no adjudication binding upon any one as to the title to the land in the old road.    But we held, proceeding upon a discussion of the proofs, that the old road had never been laid out as a highway and that it had not become such by dedication, or by user.    As it is, pertinently, pointed out by counsel, in answer to the argument upon that case, the resolution, under which Cropsey avenue, there in question, was opened, provided that, upon the confirmation and filing of the report of the commissioners, "*the lands for which award shall have been made,* shall thereupon vest in the town," etc.    The differences in the cases are well marked.    In the first place, the act of 1847 appropriated, with others, the lands in Bloomingdale road to the city for a street and declared the same to be one of the streets of the city in like manner as if laid out under the Act of 1807; which act required the land to be paid for and the city to be seized in fee thereof.    Then, the petition, which instituted the proceedings under the act, not only, alleged the road to be a street of the city; but it proposed to take for the street certain lands, which were described in the petition and which included the land in the old road.    The commis-

sioners reported that the Bloomingdale road was a street of the city, laid out under the act of 1807, and their report was confirmed by the court. Thus the land was adjudged to have been a street of the city. No award of damages by way of compensation for the interest taken in the land was called for. The city was taking its own property, with that of others, for the purpose and I think that no useless ceremonial of some nominal award was essential to the finality of the condemnation. The city was the only one to object that the commissioners had made no award as to its property. In principle, the decision in *Matter of Opening of Eleventh Avenue*, (81 N. Y. 436), applies; the difference being that there nominal damages had been awarded. I conclude, therefore, that, in determining what lands, of those described in the act, must be paid for, the commissioners acted within the prescribed lines of their duties and that the confirmation of their report upon the questions before them, by the Supreme Court, was a determination upon such questions. That their awards, as to the persons who were entitled to compensation for the lands taken, were, as a general proposition, not necessarily final, does not concern the question before us. The proceeding was upon notices published as required by the law and an opportunity was afforded for all parties in interest to be heard. Sandford, as trustee for John Hopper, Junior's, will, solely, represented the legal interests of that estate. He was notified and he was the only one who could be summoned. He did not file objections; but accepted from the city the moneys awarded for the taking of a portion of the estate lands. His acts were binding upon those, who had interests in the estate in remainder; whether those acts were of an affirmative, or of a neglectful character; in so far, certainly, as the rights of third persons are concerned. (*Bennett* v. *Garlock*, 79 N. Y. 302, 321.) It will be presumed that the moneys were duly accounted for, which he received from the awards, and it does not appear that any objection, or claim, has been made by those interested in the Hopper estate until this late day.

Very considerable stress is laid by the plaintiffs' counsel

upon the invalidity of the proceedings, consequent upon the act of 1847, by reason of defective compliance with statutory requirements in cases of the taking of lands *in invitum* their owner and of the absence of sufficient evidence to show the confirmation by a decree of the court. At the Appellate Division these technical objections met with no favor and were but slightly discussed in the prevailing opinion. I think it necessary to refer to but one of them, briefly. The referee found that " no order, or rule, of court, confirming the report of the commissioners, has been found ; " but, in the finding, he goes on to state a number of facts, which sufficiently establish that there had been such an order of confirmation. From this secondary evidence it appeared that there was upon the cover of the report, on file in the county clerk's office, this indorsement : " The foregoing report of the commissioners confirmed by the Supreme Court in General Term, March 31, 1849. James Connor clerk." Connor was county clerk at that time, but the handwriting was not identified. In a record from the office of the commissioner of public works, entitled " Assessment ledger C. Openings. Street Commissioner's Office," and under the heading therein, " Broadway opening from 7th to 10th Avenue," is a summary statement of assessments and awards and the entry : " Confirmed by the Supreme Court, March 31, 1849. Ordered open by the Common Council, August 1, 1849. Awards payable December 1, 1849." In another record, produced from the bureau of collector of assessments and arrears, are entries to similar effect. In four of the daily newspapers of the city were publications of notices, between March 31st, and April 2d, 1849, to the effect that the report had been confirmed by the General Term of the Supreme Court. On July 12th, 1849, the board of aldermen passed a resolution to the effect that " the actual widening of Bloomingdale Road between 7th Avenue and 10th Avenue would take place on August 1st, ensuing " and a collector was appointed of the assessments laid. As the order itself could not be found in the custody of the clerk, it was proper to prove that it had been made by such facts, as

the best evidence of which the case was capable. (*Fisher* v. *Mayor, etc., of N. Y.* 67 N. Y. 73, 77.) The inability to find the order did not prove its non-existence and the proof of these facts conclusively showed that it had been made by the Supreme Court. Any presumption founded upon the inability to produce, or to find, the order itself was sufficiently rebutted. Indeed, the Appellate Division, in its order of affirmance, reversed the referee on this point and makes the special finding that the facts showed an order of confirmation to have been made. In the public interest, I think that what slight evidence has survived, from a more or less remote period, of the records of courts should be accepted and relied upon. (1 Greenl. Evid. § 509.)

Finally, the decree in the partition suit, which was instituted in 1863 by Garrit H. Striker, in which were joined all parties having interests in the farm of their ancestor, John Hopper, Junior, is an effective bar to the claim in this action and estops these plaintiffs from asserting that the whole of the Hopper estate was not actually partitioned and disposed of. The complaint in the suit described, each by metes and bounds, 28 lots, or parcels, of land *as constituting the farm of which John Hopper, Junior, was seized at the time of his death.* It makes reference to a partition attempted in 1820, upon the death of John Hopper, Junior, by an action in the Mayor's Court of the city, between his devisees, who were his three grandchildren. The judgment in that action made partition and allotted to Ann Striker one-third of the lands of the testator; which, (assuming that the estate owned the fee of the roadbed), included that part of Bloomingdale road in which lay the premises in question. It was, subsequently, held that the testator had created trusts for the lives of his devisees; that the trustees held the legal title and that the partition proceedings and the mutual releases executed as to the lands set off were ineffectual; but effect was given to what had been done, to the extent of holding that the partition settled the share of each grandchild in the rents and profits. (*Brewster* v. *Striker*, 2 N. Y. 19 and *Striker* v. *Mott*, 28 ib. 82.) In 1862 Ann

Striker died, unmarried and intestate. Her share became vested in her brother, Garrit H. Striker, and her sister, Winifred Mott. The plaintiffs in their partition action requested, in their complaint, that the earlier interests in severalty, which had been decreed in the suit of 1820, should be recognized and that, in partitioning the estate, allotments from Ann Striker's share, as equitably severed, should be made to her surviving brothers and sister. That was so adjudged and in the partition the premises in question lay in the roadbed between parcels allotted on either side of Broadway to Garrit S. and Ruth A., children of Winifred, whose grandchildren these plaintiffs are. In the complaint, in the partition suit of 1863, the boundaries of the parcels abutting on Broadway are such as to exclude the street. To their description is added, in each case, however, the clause: " together with all the right, interests, claims and demands of the owners * * * in the streets and avenues adjoining the same, by reason of such * * * having been taken, pursuant to the statutes in that behalf made and provided, from such owners to form such streets and avenues." Commissioners were appointed by the judgment to make actual partition ; who caused a map to be filed showing the 28 parcels and Broadway as it existed under the opening proceedings of the act of 1847. They partitioned the lots, abutting upon that part of Broadway in question, by their numbers upon the map, followed by a description ; which of itself, by following the " side," or the " line," of the streets bounding them, would exclude the bed of the street. Their report was confirmed by a decree ; which, repeating the descriptions of the parcels used by the commissioners, vested in each of the parties the premises allotted by the commissioners, as " *constituting his, (or her) share of the said lands and premises.*" As it was the intention of all parties to partition all of the Hopper lands, in which they were interested, it follows that Garrit S. Mott and Ruth Ann Mott, through whom the defendant derives his title, either, were not entitled to, and did not have, an interest in the land in Broadway, by reason of the fact, (deter-

mined theretofore, and accepted), that it was owned by the city and was no part of the Hopper estate ; or the description of their allotments in partition must be deemed to have included the roadbed. Either view, it seems to me, disposes of the plaintiffs' claim of title. The latter view was taken by the Appellate Division justices ; who held, however, that by the subsequent deeds of these parties, the roadbed was excluded from the grant. If the commissioners' allotments were only of the abutting lots, to which opinion I am inclined, then the plaintiffs' ancestors were estopped from claiming any interest in the street. They acquiesced in a determination in their partition proceedings that there was title to the abutting lots, only, and they could not assert, as against their grantees, that an interest in the street was unpartitioned. If they were estopped, that estoppel operated upon the plaintiffs' claim. But if there was title to the land in the street, upon any theory of the plaintiffs that it had not been divested, we should hold that the commissioners' allotments included the land in the street. Their interpretation is not to be determined, under the circumstances, solely, by the language of the description. Reference may be had to what the facts evidence as the intention of the parties. If they warrant the presumption that it was intended to convey to the center of the street, that presumption will control. (*Graham* v. *Stern*, 168 N. Y. 517.) Such should be the presumption here. The complaint evidences the purpose to partition all of the estate, whether it consist in the lots particularly described, or in an interest in the beds of the streets. There is nothing to justify an inference that the decree in partition left any property unpartitioned. The cases, to which we are referred as holding that a description by metes and bounds excludes the roadbed, are not controlling. It is, unquestionably, a general rule that a conveyance of lands bounded upon, or along, a street will carry the grantor's title to the center of the street and it is founded upon the presumption of an absence of intention on his part to reserve what becomes useless to him. (*Graham* v. *Stern*, *supra.*) If the grant is restricted by the descrip-

tion, and there is nothing to modify it and to show a different intention, the restrictive words must be allowed to control. That intention, however, may be gathered from what circumstances serve to enlighten the transaction. In this case, the allotments by the commissioners describe the lots by map numbers, as well as by metes and bounds. The suit and the relations of the parties show that what was intended was an actual partition of all of the real estate, without reservation, of which their ancestor died seized. Without the interpretation that the land in the roadbed was included, the partition had been an abortive proceeding. Therefore, the ancestors of the plaintiffs must be deemed to have taken by their allotments to the center of Broadway. If that be true, then, in the conveyances to Field by Garrit S. Mott and Ruth Ann Mott, it will be presumed that they granted what they took by their allotments; for the description is in language similar to that used by the commissioners. In the prevailing opinion at the Appellate Division, it was held that, in the absence of evidence to show an intention in Field's grantors to grant their interests in the roadbed, such as existed with respect to the commissioners' allotments, the conveyances will not be interpreted to include them. This is too strict an application of the rule governing descriptive clauses in grants. The descriptive words were practically, if not quite, the same as those used by the commissioners and the same ambiguity exists, in coupling with a description by lot numbers upon the map a description by metes and bounds. In such a case, I think there should, affirmatively, appear some fact, or circumstance, which would justify, if not compel, the presumption that the grantors intended to reserve their interests in the streets. There was none such and the doubt, or the ambiguity, as to the intent of a description by lot numbers and by metes and bounds in deeds, following upon the allotments in partition, should be resolved in favor of a construction that the grantor was conveying all of the interest in, or appurtenant to his ownership of, the land that he had received.

The act of 1869, (L. 1869, chap. 890), requires no discus-

sion in view of what has been held. The defendant's predecessors in title succeeded to the city's interest in the abandoned part of the street, by virtue of the provisions of the act and of his compliance therewith. If any defect in his title exists, it is not for the plaintiffs to object. They must depend upon the strength of their own title for a recovery of the possession of the land.

I have, somewhat imperfectly, discussed the important questions, which have been argued at great length and with great ability. They are complicated and, as I have said, not free from difficulty in their determination; but the conclusion which I, unhesitatingly, reach is that the objections to the plaintiffs' title, so far as they rest upon the provisions of the act of 1847, the proceedings thereunder and the subsequent actual partition suit of 1863, are insuperable.

I, therefore, advise that the judgment appealed from be reversed and that the complaint be dismissed upon the merits; with costs to the defendant in all the courts.

CULLEN, Ch. J. I concur in the opinion of Judge GRAY, except in the view that the proceedings or judgment in the partition action between the Hopper heirs estopped the plaintiffs or their predecessors in title from asserting any claim to the soil of the Bloomingdale road, and in the view that the condemnation proceedings under the act of 1847 operated as an adjudication that the plaintiffs or their ancestors had no title to said road. As to the latter proposition I entirely agree with Judge GRAY that such proceedings were sufficiently proved, my difference with him being as to the effect of those proceedings, assuming them to have been entirely regular. I, therefore, vote for reversal of the judgments below on the ground stated in the opinion of Judge GRAY, that the enactment of the statute of 1847 (Chap. 403) appropriated *eo instanti* the lands described in it and vested the fee thereof in the city of New York, leaving to the former owners the right to obtain compensation for such appropriation from the city of New York through proceedings therefor authorized

by statute. (*McCormack* v. *City of Brooklyn*, 108 N. Y. 49 ; *Donnelly* v. *Same*, 121 N. Y. 9 ; *Magee* v. *Same*, 144 N. Y. 265.) I desire, however, to add a few words to those expressed by my associate.

It cannot be successfully denied that if the city of New York acquired title under this statute, to the roadbed of the old Bloomingdale road, that title was an estate in fee, for such has been the character of the interest acquired by the city in all its public streets since the statute of 1807 (Chap. 115). The act of 1847, after describing the piece of land taken by metes and bounds, declares the same "for all legal purposes to be one of the streets of the said city." Had the section ended with the words quoted it could not well be disputed that, under the authorities cited, the statute worked a present appropriation of the land ; but following these words is the provision : "As if the same had been so laid out by the commissioners appointed in and by the act entitled 'An Act relative to improvements touching the laying out of streets and roads in the City of New York and for other purposes,' passed April 3rd, 1807." The act of 1807 provided for the establishment by the commissioners appointed thereunder of a permanent plan for the streets and avenues of the city of New York. It did not operate as a present opening of those streets or a dedication of the land therein to public use, but provided that the municipal authorities might subsequently open streets in accordance with that plan, to which plan those authorities were restricted. (*Matter of Rhinelander*, 68 N. Y. 105.) On this ground the learned counsel for the plaintiffs contend that the sole intention and effect of the act of 1847 was to alter the commissioners' map and enable the city to acquire the lands described in the act if and when it deemed proper. In support of this construction it is urged that many statutes have been enacted since the filing of the map made by the commissioners under the law of 1807, in substantially the same terms as the statute before us, the accepted interpretation of which by landowners and municipal authorities has been that their effect was only to alter the commissioners' plan, not

to appropriate the lands, and in this respect we have been referred to Valentine's Laws relating to the City of New York. An examination of those statutes shows that there is no uniformity in their character or phraseology. Some provide that the lands described therein "shall be opened." Such acts plainly contemplate the prosecution of opening proceedings as a condition of the acquisition of title. In many cases the title of the statute would indicate that the sole intention of the Legislature was to change the commissioners' map or plan. In others the direction or authority is to extend or continue certain existing streets without specific descriptions of the land to be taken for that purpose. In some of the cases, such as those relating to the present Lexington avenue (Chap. 101, Laws 1832; chap. 148, Laws 1838) the phraseology of the statute is substantially similar to that in the act before us. There is, however, so far as our research goes, a vital distinction between those statutes and the statutes relating to the Bloomingdale road, including the one before us; that is to say, the Bloomingdale road was an actual, existing and traveled highway at the time of the enactment of the law of 1847, and the description of the lands declared to be a public street include not only the additional lands, but those within the bounds and limits of the highway itself. In the case of the Lexington avenue statutes they were entirely new streets, and it may well be argued that it was intended that such streets should be opened and title thereto acquired by the city only as public needs might require the opening of other streets in the vicinity. The situation with reference to the piece of the Bloomingdale road affected by the act of 1847 was entirely different. There was no new street or highway to be opened; the road was not to be discontinued as a highway until the municipal authorities should at some time in the future deem it proper to open the new street. On the contrary, the legislature determined that the existing road should be immediately widened and as widened not only the additional lands taken, but the soil of the road itself (in which it may be the public theretofore had only an easement)

should be vested in the city to the same extent and manner as other actually opened and existing streets. As the city under that statute acquired the fee of the premises in dispute the right of the plaintiff's ancestors was solely to proceed against the city for compensation. Their title to the land in suit had gone and has never subsequently been acquired by them.

The judgments should be reversed and the complaint dismissed.

O'Brien, J. I agree with the result of Judge Gray's opinion, and my reasons can be stated in a few words. The proceedings under the act of 1847, which occupy such a prominent place in the record and in the briefs of counsel, were not, I think, proceedings to acquire title to lands for street purposes, but proceedings to determine the damages which should be awarded to the owners of lands already taken and appropriated for that purpose.

Chapter 203 of the Laws of 1847 is entitled " An Act to lay out a new street in the 12th Ward of the City of New York and to keep open a part of Bloomingdale Road in said City." The statute then proceeds to describe certain lands with great particularity by metes and bounds, and closes in these words : That such lands are " hereby declared for all legal purposes to be one of the streets of the said city in like manner as if the same had been so laid out by the commissioners appointed in and by the act entitled ' An Act relative to improvements touching the laying out of streets and roads in the City of New York and for other purposes,' passed April 3d, 1807." It is conceded that the lands in question are embraced within the description contained in the statute. The legislature had the undoubted power to condemn, or appropriate lands for street purposes, and it had the power to appropriate it in fee. That was the legal effect of the action of the legislature as expressed in the statute, and it has been so held by this court in construing statutes of a similar character. (*Spears* v. *Mayor, etc., of N. Y.,* 87 N. Y. 359, 368; *Sage* v. *City of Brooklyn,* 89 N. Y. 189; *McCormack* v. *City of Brooklyn,*

108 N. Y. 49; *Magee* v. *City of Brooklyn,* 144 N. Y. 265, 268; *Donnelly* v. *City of Brooklyn,* 121 N. Y. 9.)

The legal operation of the statute, therefore, was to divest the then owners of all interest in the lands in question and transfer the same to the city. All that remained for the city to do after the statute took effect was to proceed under laws then existing to ascertain the damages that any private parties had sustained, or could claim, by reason of the taking of their lands, and the proceedings of the commissioners and the courts subsequent to the passage of the statute were entirely sufficient for that purpose.

I do not think that the nature or quality of the estate appropriated by the statute is at all limited or reduced to something less than a fee by the closing words above quoted. On the contrary, it seems to me that the purpose of the legislature to take the lands in fee is made clearer by those words, since they declare that the lands should be deemed for all legal purposes to be one of the streets of the city in like manner as if the same was laid out by the commissioners appointed in and by the act of April 3d, 1807. On looking into that act we find that it is provided that lands taken as therein prescribed for street purposes shall vest in fee in the city. The words are that the "mayor, aldermen and commonalty of the City of New York shall be and become seized in fee of all such lands, tenements and hereditaments." (Laws of 1807, chap. 115, sec. 9.)

Hence, I conclude that the statute, by its own force and effect, took and appropriated the lands in question in fee, leaving the question of damages to be ascertained under existing laws, which were substantially followed by awarding to the owners such damages as they had sustained by the operation of the statute. Thus all title in the Hopper heirs, or any other private parties, was divested and transferred to the city. If I am right in this position, it must follow that the plaintiffs have no title to the lands in question, and that proposition necessarily defeats this action, even if there were any defects in the proceedings for the ascertainment of the damages.

But I do not think that there were any such defects, certainly none that can benefit the plaintiffs.

The proceedings in the partition case and the sale thereunder were doubtless a recognition of this situation as between all the parties to that proceeding. Hence, I am for reversal.

BARTLETT, J. I agree with the conclusion reached by Judge GRAY that the judgment appealed from should be reversed and the complaint dismissed upon the merits. I also agree with his opinion, save in one particular, relating to the act of 1787, chapter 61, being "An Act for the better regulating of the public roads in the City and County of New York," in regard to which he states that he is not prepared to say that the referee was in error in determining upon the evidence that it was not shown that John Hopper, Jr., was divested of the fee of his land in the Bloomingdale road by reason of the proceedings under the act of 1787, and that he is of opinion that the evidence furnished as to such proceedings having been taken is an insecure ground upon which to rest.

As pointed out by the learned counsel for the defendant, "from the day of the death of John Hopper, Sr., which was prior to the year 1779, down to the year 1893, when this suit was commenced, a period of one hundred and fourteen years, the heirs of John Hopper, Sr., have never asserted any claim or title in any manner, form or shape to any portion of the bed of Bloomingdale road. The very first words which we hear them utter in respect to their father's property describe it as lying 'adjoining the road called the Bloomingdale Road, running from the west side of said Road to the River, and from the east side of the Road running to the Commons,' a plain admission that their father did not own the bed of that Road."

John Hopper, Sr., succeeded to the title of his father, Matthias Hoppe; he died prior to July, 1779, leaving a last will and testament dated in October, 1778, whereby he gave to his five sons and four grandsons all his real estate lying in the Out ward of the city of New York, being divided in the manner prescribed in the will. In accordance with the scheme

of this will, an agreement of partition was made between the devisees mentioned therein, which commences with the following recital: "Whereas, John Hopper, late of the outward of the City of New York, farmer, among other real estates was possessed of lands and tenements situate in the outward of the City of New York, *adjoining the road called the Blooming-dale Road, running from the west side of said road to the North River, and from the east side of said road to the Commons.*"

It was set forth in this agrement, in substance, that the parties had agreed to and with each other to lay out said farm in six equal lots, viz.: "On the west side of said road in six equal lots, to be numbered 1 to 6; and on the east side of said road, to be numbered 1 to 6, and to match said lots in a certain manner and as follows: Lot No. 6 on the west side with Lot No. 6 on the east side, and then to be drawn for in manner mentioned in said John Hopper's will." It appears that lots six on the east and west sides of the road fell to the testator's son, John, known in this proceeding as John Hopper, Jr.

It seems to me that at this early day the devisees under the will of John Hopper, Sr., recognized the fact, in the language just quoted, that the fee of the bed of the Bloomingdale road was in the city. The cases cited as sustaining a contrary view do not apply for the reason that this is a partition suit of lands which belonged to John Hopper, Sr., and if the title to the bed of the road was in him at the time of his death, this recitation in the partition agreement just quoted would necessarily have recognized that fact and established the dividing line as the center of the road.

The learned referee found (sixteenth finding) that between the years 1782 and 1819 the Bloomingdale road was actually widened from the width of about two rods to the width of about four rods, as shown by a map made by John Randel, referred to in the twentieth finding. He also found (seventeenth finding) that in the years 1791 to 1797 various proceedings were taken by the common council of the city of New York to extend the road from its then terminus in the lands

of Nicholas De Peyster to the Kingsbridge road and to restore it to the width of four rods. He also found (nineteenth finding), after referring to map or survey made by John Randel, bearing date September 20th, 1819, and which was on file in the department of public works of the city of New York, and had been for more than eighty years, that upon said map the boundaries of the tracts of land on the east and west sides of the Bloomingdale road, upon which the name of John Hopper appears, agree substantially, with reference to the said road and the streets, with the boundaries of lots six and six shown upon the partition map made by Evert Bancker, dated February, 1782, and that the width of the Bloomingdale road between said parcels is approximately four rods.

The act of 1787 authorized and empowered the mayor, aldermen and commonalty of the city of New York to alter and widen roads and highways already laid out to such a convenient width, not exceeding four rods, nor less than two rods, as the commissioner should deem fit. The provisions of the act clearly authorized the acquiring of the fee of the lands taken either by purchase or condemnation proceedings.

In the absence of complete record proof of proceedings under the act of 1787, it was competent for the defendant to offer secondary evidence of their existence. The strict rules of evidence are relaxed when a party seeks to prove proceedings that lie back of the memories of the living. The nonexistence of complete records of transactions in the early history of the city of New York is not unusual and resort has been often had to secondary evidence. The referee has found that between the years 1782 and 1819 the Bloomingdale road was widened from two to four rods, and in view of other facts the presumption is very strong that it was accomplished under the act of 1787.

I will now call attention to the facts proven by the defendant, tending to show that proceedings were instituted and conducted to a conclusion under the act of 1787. On the 14th of May, 1793, it was ordered by the common council that "said road from its commencement at Horne's house

(which was at Twenty-first street) to Nicholas de Peyster's barn (which was far above the premises in question), be immediately opened to its proper and legal width of four rods." At this time there was no other authority for the action of the common council except the act of 1787. If any proceedings were taken under the act, this ordinance of the common council may be regarded as their inception.

The defendant then put in evidence the Bancker map, made in 1782, which shows the road two rods wide, and the Doughty map, made in 1820, which shows that the road was then four rods wide or thereabouts, and the Randel map, made about 1820, which also shows the road four rods wide. It is, therefore, made clear that the widening took place between these dates, and the referee has so found, as already pointed out. If the proof had gone no further than this, the learned counsel for the defendant insists that the rule of law in regard to ancient proceedings is that having proved their inception, and that they were carried to completion, all intermediate steps are presumed to have been regularly taken, quoting in this connection the Latin maxim : " *Extremis probatis, ex diuturnitate temporis, omnia præsumuntur rite esse acta.*"

Additional evidence was, however, given as follows :

1st. The resolution of the fourth of September, 1797, whereby, on a petition for the opening of the Bloomingdale road to its proper width of four rods, two aldermen were appointed a committee to direct the proprietors of land, where the road is not of its proper width, to remove their fences, and then to direct the roadmaster to work and put the road in good order.

2nd. A release by Nicholas de Peyster and others, dated the 24th of March, 1795, reciting that the mayor, aldermen and commonalty had lawfully " laid out, regulated and continued a public highway or road commonly called the Bloomingdale Road of the breadth of four rods through the lands," etc., and releasing to the city " all the lands necessary for the said road for a breadth of four rods."

3rd. A resolution of the common council passed the 7th of

April, 1795, directing the said release to be proved, deposited in the clerk's office and recorded.

4th. An extract from the common council's minutes of July 13th, 1795, showing that Mr. de Peyster and others had released, or were willing to release, the ground needed for the road to the corporation, but that Molenaer and Meyer had not released, and that the committee had laid out the road of the designated width across their lands.

5th. Minutes of the Mayor's Court of September 15th, 1795, showing that proceedings were taken for the condemnation of the lands of Molenaer and Meyer, who had refused to release.

The defendant's counsel points out that the last-mentioned proceeding related to the lands north of the premises in question, but insists that they showed that the city, during the years 1793 to 1797, was conducting proceedings under the act of 1787 to widen the old road and to continue it further north.

In my opinion the above proofs, in addition to the proof of the inception and completion of the proceedings to which reference has already been made, lead to the conclusive presumption that the widening of the Bloomingdale road at the point and between the years in question, was by proceedings taken under the act of 1787.

Whatever proceedings may have been had under the acts of 1807, 1813 and 1847, are necessarily, in my opinion, to be regarded as confirmatory of the proceedings under the act of 1787 so far as the farm of John Hopper, Sr., is concerned, which is the only land involved in this litigation.

There is no doubt that it is a matter of historical proof that the beginnings of the Bloomingdale road date back to the occupation of Manhattan island by the Dutch, and that it may be assumed that such title to the bed of the road as was then acquired was in the government, as under the Dutch law no compensation was paid for private property taken for public use.

Under the Dongan charter of 1686, after the English conquest, it was provided that the limits of Manhattan island were co-terminus with the island. The Bloomingdale road in

its earliest days was doubtless within the limits of the city of New York.

The defendant's argument, under the act of 1787, is that at the close of the Revolutionary war the legislature took up the subject of roads and streets within the city of New York and passed the act of 1787.

Cullen, Ch. J., O'Brien and Bartlett, JJ., concur in opinions with Gray, J., and Haight, Vann and Werner, JJ., concur with Cullen, Ch. J.

Judgment accordingly.