WILLIAM W. APPLETON et al., as Trustees under the Will of JAMES E. COOLEY, Deceased, et al., Appellants, v. THE CITY OF NEW YORK, Respondent.

Streets — New York (city of) — titles to lands granted by the Dutch sovereignty under the Roman-Dutch law — executory rights of Dutch sovereignty in such lands — such rights did not pass to British crown under the capitulation articles and treaties but to the lord of the manor under the common law — by the dedication of such land for street purposes the fee of the soil did not pass to the city but remained in the abutting owner subject to the public use — right of the city to enforce ordinance prohibiting vaults under the sidewalk in such a street, without municipal permission and payment of a fixed sum for vault space occupied.

1. The plaintiffs seek in this action in equity a judgment perpetually restraining the defendant from claiming any estate in or interfering with vaults or vault spaces connected with their premises under the surface of the northerly half of Cortlandt street in the city of New York. Municipal ordinances in force at the time of the construction of the vaults forbade, under a penalty, such construction in any of the streets of the city without the written municipal permission and the payment of a sum for each square foot of vault space occupied. No permission has been granted or payment made for the vaults at any time. The proper municipal authority demanded of the plaintiffs that they obtain a permit and make the required payment, and threatened, in case of their default, to wall up the vaults. The original source of the title of the plaintiffs to their premises and of the claimed fee in the land of the street was a grant in 1644 from the government of the United Netherlands.

2. The executory prerogatives, privileges and rights, which by virtue of the Roman-Dutch law inhered in the Dutch sovereignty and which were foreign to British sovereignty and its common law, did not pass, under the capitulation articles and treaties, to the British crown or its representative. Under the common law of England the title to the land in a street or highway was not in the king, but in the lord of the manor, subject only to the easement of the public to a way over it. Hence, the fee of the lands as and when devoted to the street did not pass to the British crown.

3. A declaration and petition and a resolution or order of the common council of the city in 1733 conclusively established the

dedication of forty feet, the then width of the street, to the public for the purposes of a public street. By the common law, in the act of dedication, the fee of the soil remained in the owners but the use of the street was vested in the public. Hence, the defendant has not at any time held the fee to the original forty feet of the street.

4. A proceeding taken under a statute enacted in 1784 effected the widening of the street by five feet on each side. It does not appear that a fee was taken or sought. An easement fulfilled its intendment and purposes and constituted the interest taken, and the defendant did not then obtain and has not any time held the fee to the land used in widening the street.

5. The right on the part of the city to enforce its ordinance exists, however, as to the owner of the land contiguous to the land of the street, irrespective of the ownership of the fee of the latter, because it is an element in the authorized regulation and supervision of the street imposed by the public authorities, whose right to exact a payment or fee, in the process of regulation, for a permission or advantage, consistent with the public uses, is undoubted. (*Dunham* v. *Williams*, 37 N. Y. 251, 253, distinguished.)

*Appleton* v. *City of New York*, 163 App. Div. 680, affirmed.

(Argued April 25, 1916; decided October 3, 1916.)

APPEAL from a judgment entered January 13, 1915, upon an order of the Appellate Division of the Supreme Court in the first judicial department reversing a judgment in favor of plaintiffs entered upon a decision of the court on trial at Special Term and dismissing the complaint upon the merits.

The nature of the action and the facts, so far as material, are stated in the opinion.

*J. Hampden Dougherty* for appellants. The findings of the Appellate Division so far as they conflict with those of the Special Term are without any evidence whatever to sustain them, and are unwarranted in law. (*Lauderdale Peerage Claim*, 17 Abb. [N. C.] 462; *Johnson* v. *McIntosh*, 8 Wheat. 543; *Martin* v. *Waddell*, 16 Pet. 407; *Canal Comrs.* v. *People*, 5 Wend. 445; *Canal Appraisers* v. *People*, 17 Wend. 571; *Mortimer* v.

*N. Y. El. R. R. Co.*, 25 J. & S. 244; *Hine* v. *N. Y. El. R. R. Co.*, 54 Hun, 425; *Paige* v. *Schenectady Ry. Co.*, 178 N. Y. 102; *Hi ckel* . v. *Stevens*, 165 N. Y. 171.) Assuming that during Dutch occupancy streets or roads might have been opened without compensation through lands which were the subject of Dutch ground briefs, the right of government to open streets without compensation terminated upon the surrender to the English or, in any event, upon the final treaty of cession in 1674, and became altogether non-existent. No such right was ever transferred to the English crown or now inheres in the city of New York. (*Matter of John & Cherry Sts.*, 19 Wend. 659; Dillon on Mun. Corp. [5th ed.] § 1194; 2 Herman on Estoppel & Res Judicata, 1363; 20 Am. & Eng. Ency. of Law, 1182; *Peck* v. *Burr*, 10 N. Y. 294; *Moore* v. *Mayor, etc.*, 73 N. Y. 248; *Curnen* v. *Mayor, etc.*, 79 N. Y. 511.) The findings of the Appellate Division that dedication was neither recognized by statute nor developed at common law as early as 1733 is without evidence to sustain it, nor is it in accord with fact. (*Gowen* v. *P. Exch. Co.*, 5 W. & S. 141; *Grogan* v. *Hayward*, 4 Fed. Rep. 161; *Jersey City* v. *Morris Canal, etc., Co.*, 12 N. J. Eq. 547; *State* v. *Otoe County*, 6 Neb. 129; *Hunter* v. *Sandy Hill*, 6 Hill, 407; *McKinney* v. *Griggs*, 5 Bush [Ky.], 405; *Bessemer Land, etc., Co.* v. *Jenkins*, 111 Ala 135; *Elyton Land Co.* v. *South & North Ala. R. R. Co.*, 95 Ala. 631; *Wood* v. *Veal*, 5 B. & Ald. 454.) The finding of the Appellate Division that Cortlandt street must be presumed to have been opened under the colonial statute of October 1, 1691, is without any evidence to support it. Nor is it in accordance with law. (10 Am. & Eng. Ency. of Law [2d ed.], 73; 13 Cyc. of Law & Pr. 486, 487B; Elliott on Roads & Streets, §§ 115, 125, 137; Gerard on Streets, Wharves, etc., 156, 157; *Williams* v. *N. C. Cent. R. R. Co.*, 16 N. Y. 97; *Kelsey* v. *King*, 1 Trans. App. 138; *Matter of Rapid Transit R. R. Comrs.*, 197 N. Y. 81; *Mott* v. *Eno*, 181 N. Y. 346;

*Bradley* v. *Crane*, 201 N. Y. 14.) The "presumption" in which the Appellate Division erroneously indulged, that the original street had been opened under the act of 1691, has obviously no application to the five-foot strip. (*Mott* v. *Eno*, 181 N. Y. 346; *Bradley* v. *Crane*, 201 N. Y. 14.) The city ordinances fail to distinguish streets in which it owns a fee from streets in which the fee is in a private proprietor. In providing that before a permit for the use of vault space shall be issued the same kind and rate of charge shall be made in each of these different classes of cases, the ordinances not only deprive the fee owner of his property in the street without due process of law, but also deny to him the equal protection of the laws. (*Matter of Gilbert El. Ry. Co.*, 38 Hun, 438; *Story* v. *N. Y. El. R. R. Co.*, 90 N. Y. 122; *Perley* v. *Chandler*, 6 Mass. 454; *Allen* v. *City of Boston*, 159 Mass. 324; *McCarthy* v. *City of Syracuse*, 46 N. Y. 194; *Mairs* v. *Association*, 89 N. Y. 498; *Williams* v. *Kennedy*, 14 Barb. 629; *Cortelyou* v. *Van Brunt*, 2 Johns. 357; *Jackson* v. *Hathaway*, 15 Johns. 447; *Town of Salem* v. *R. Plank Road*, 27 Barb. 543.) The city has no right to demand compensation from the owner of the fee of the street for the use of the vault space. The ordinances are unconstitutional and void. (*Tacoma S. D. Co.* v. *City of Chicago*, 247 Ill. 192; *Sears* v. *City of Chicago*, 247 Ill. 204.)

*Lamar Hardy, Corporation Counsel* (*Terence Farley* and *Leon N. Futter* of counsel), for respondent. If the city owns the bed of Cortlandt street, then unquestionably it has the right to charge anything it sees fit for the privilege of constructing vaults. (3 Dillon Mun. Corp. [5th ed.] §§ 1178, 1180.) So far as the right to use the subsurface of a street for vault purposes is concerned, it makes no difference who owns the fee. If the abutting proprietor owns it, he cannot construct a vault without the permission of the municipal authorities and subject to such terms and

conditions as they may impose. And such a permit is subject to revocation at any time when the public necessities require it. (*Patten* v. *N. Y. El. R. Co.*, 3 Abb. [N. C.] 306; *Deshong* v. *City of New York*, 74 App. Div. 234; 176 N. Y. 475; *Lincoln Safe Deposit Co.* v. *City of New York*, 96 App. Div. 624; 210 N. Y. 34; *City of New York* v. *De Peyster*, 120 App. Div. 762; 190 N. Y. 547; *Potter* v. *Interborough R. T. Co.*, 54 Misc. Rep. 423; 124 App. Div. 920; *New York Steam Co.* v. *Foundation Co.*, 195 N. Y. 43; *Tiernan* v. *City of Lincoln*, 32 L. R. A. [N. S.] 1034; *Sears* v. *City of Chicago*, 247 Ill. 204; *Tacoma S. D. Co.* v. *City of Chicago*, 247 Ill. 192; *People ex rel. Mather* v. *Marshall Field & Co.*, 266 Ill. 609; *Peabody* v. *City of Boston*, 220 Mass. 376.) Plaintiff's contention that "the findings of the Appellate Division, so far as they conflict with those of the Special Term, are without any evidence whatever to sustain them, and are unwarranted in law," cannot be sustained. (*Campbell* v. *Hall*, 1 Cowp. 204; *Constantine* v. *Van Winkle*, 6 Hill, 177; *Overbagh* v. *Patrie*, 8 Barb. 28; *People* v. *Livingston*, 8 Barb. 253; *Bartow* v. *Draper*, 5 Duer, 130; *Wetmore* v. *Story*, 22 Barb. 414; *Dunham* v. *Williams*, 37 N. Y. 251; *Levy* v. *Levy*, 33 N. Y. 97; *Story* v. *N. Y. El. R. R. Co.*, 3 Abb. [N. C.] 478; *Van Giesen* v. *Bridgford*, 18 Hun, 73.) The Damen grant, which was made under the Roman-Dutch law, was coupled with the condition that if, at any time thereafter, streets were laid out through the land granted, title to the beds of the streets should revert to the sovereign. That right of the Dutch government to a' reversion was a property right, and upon the capitulation the property rights of the Dutch government, under the law of nations, were transferred to and subsequently vested in the English crown. Hence the property rights of the English crown subsequently vested in the city of New York. (Gerard on Water Rights, Streets & Real Estate, 127, 128; *People* v. *Liv-*

*ingston,* 8 Barb. 253; *Mitchell* v. *Einstein,* 105 App. Div. 413; *Bartow* v. *Draper,* 5 Duer, 131; *Wetmore* v. *Story,* 22 Barb. 439; *Williams* v. *N. Y. C. R. R. Co.,* 16 N. Y. 97; *Dunham* v. *Williams,* 36 Barb. 142; 37 N. Y. 253.) The findings of the Appellate Division that dedication was neither recognized by statute nor developed at common law as early as 1733 is sustained by the evidence, and it is in accord with fact. (Angell on Highways [3d ed.], § 133; Jones on Easements, § 422; 1 Reeves on Real Prop. 221; Washburn on Easements, 207; Clark's Col. Law, 15; 1 Steph. Com. [ed. 1874] 105; *Morris* v. *Van Deren,* 1 Dallas [Penn.], 64; *De Ruyter* v. *Trustees of St. Peter's Church,* 3 Barb. Ch. 119; *Morgan* v. *King,* 30 Barb. 9; 35 N. Y. 458; *Hooker* v. *Cummings,* 20 Johns. 90; *Williams* v. *Williams,* 8 N. Y. 525; *Hill* v. *Supervisors,* 12 N. Y. 52; *M. A. Baptist Church* v. *Baptist Church,* 46 N. Y. 131; *Cutting* v. *Cutting,* 86 N. Y. 522; *Town of Brookhaven* v. *Smith,* 188 N. Y. 74; *Barnes* v. *Midland R. R. Terminal Co.,* 193 N. Y. 378; *Fulton L., H. & P. Co.* v. *State of New York,* 200 N. Y. 400; *Matter of Carnegie Trust Co.,* 206 N. Y. 390.) The finding of the Appellate Division that Cortlandt street must be presumed to have been opened under the colonial statute of October 1, 1691, is sustained by the evidence, and is in accordance with law. (*Bartow* v. *Draper,* 5 Duer, 130.) The widening of Cortlandt street in 1784 must be deemed to have been accomplished pursuant to the then existing laws. (*Bartow* v. *Draper,* 5 Duer, 130; *Sherman* v. *McKeon,* 8 Bosw. 103.) The law is well settled in this state that the city owns the fee of the land occupied by the streets, whether such streets were laid out under the Dutch regime, or during the colonial period, or subsequently, after the organization of the state government. (*Kane* v. *N. Y. El. R. R. Co.,* 125 N. Y. 164; *People* v. *Kerr,* 27 N. Y. 188; *Kellinger* v. *Forty-second Street & G. St. F. R. R. Co.,* 50 N. Y. 206; *Story* v. *N. Y. El. R. R. Co.,* 90 N. Y. 122; *Lahr* v. *Metro. R. R. Co.,* 104 N. Y.

268; *Knickerbocker Ice Co.* v. *Forty-second St. R. R. Co.*, 176 N. Y. 408.)

COLLIN, J.    The plaintiffs seek in this action in equity a judgment perpetually restraining the defendant from claiming any estate in or interfering with vaults or vault spaces under the surface of the northerly half of Cortlandt street in the city of New York connected with the premises of the plaintiffs at the northwest corner of Broadway and Cortlandt street.    The Special Term awarded the judgment sought by the plaintiffs, which the Appellate Division reversed and dismissed the complaint on the merits.

The immediate inducement of the action was the threat of the defendant that unless the plaintiffs procured from and paid the defendant for a permit for the vault spaces, it would deprive the plaintiffs and their tenants of the use of them.    The plaintiffs assert that the threatened action is unlawful because they own in fee simple the bed of the part of Cortlandt street in which the vault spaces are.

The Appellate Division and the Special Term are in disagreement in regard to certain of the cardinal facts. There are, however, facts found by the Special Term which the Appellate Division did not reverse.    Of them are the following: The source of the title of the plaintiffs to their premises and of the claimed fee in the land of the street was a grant, of April 25, 1644, by a ground brief of Director General Kieft in behalf of the States General of the United Netherlands, to Jan Jansen Damen.    Cortlandt street did not then exist.    On or about May 25, 1733, the then owners of the land in question, and the owners of other lands, filed with the common council of the city of New York their declaration and petition which recited that they were possessed of certain parcels of land on the west side of Broadway and running from thence to Hudsons river, and for the improvement of them they

and "others concerned in the said lands by mutual consent and agreement have laid and staked out a certain New Street through the said lands from the Broadway aforesaid to Hudsons River of forty foot in breadth and called the name thereof Cortlandt street," and stated that they "therefore hereby declare and make known that the said New Street so laid out of forty foot English Measure in breadth through the lands aforesaid and called Cortlandt street shall forever remain, continue and be a Publick Street and Highway in like manner as the other Publick Streets of this City now are or lawfully ought to be," and prayed that "their Declaration and Petition may be recorded in the Record of the Common Council of this Corporation." The common council granted the petition. In 1788 Cortlandt street was widened, under the Laws of 1784, chapter 56, ten feet by the addition of five feet on each side. The plaintiffs or their predecessors in title about the year 1859 constructed, and there have since then existed, vaults under the beds of Cortlandt street and Broadway contiguous to the said premises at the corner of those streets. Municipal ordinances in force at the time of the construction forbade, under a penalty, the construction of a vault in any of the streets of the city without the written municipal permission and the payment of a sum for each square foot of vault space occupied. No permission or payment for the vaults has at any time existed. Ordinances of a cognate nature have existed at all times since 1859. In 1912 the defendant first learned of the extent of the vaults, and the proper municipal authority demanded of the plaintiffs that they obtain a permit and make the required payment, and threatened, in case of their default, to wall up the vaults. Other findings will be referred to as they become relevant.

The plaintiffs assert that Jan Jansen Damen was, through the ground brief, vested by the Dutch sovereignty with the fee of the forty feet of the lands which

subsequently were occupied by the street, which, transmitted to his successors in title by mesne grants, did not pass from them in 1733 by virtue of the Roman-Dutch law, because the Roman-Dutch law had ceased to exist as to it, or by virtue of the declaration and petition of 1733, and by mesne conveyances such fee is now in the plaintiffs; and that the defendant acquired in 1788 in the proceeding under the statute of 1784 an easement only in the ten feet added to the width of the street. The defendant asserts that the sovereign grant to Damen, in its effect and extent, was defined by the Roman-Dutch law, under which sovereignty was revested with the fee of lands granted by it in private ownership and subsequently appropriated for a public street or highway; that such sovereign right of revestment was property and was transferred, under the capitulation articles of 1664, the treaty of Breda of 1667 and the treaty of Westminster of 1674, to the British Crown and thence, through royal grant and charters, passed to the defendant, vesting in it the fee of the original forty feet; and further, that the action of the owners, assuming that the fee was in them, and the common council in 1733 was not a dedication of a street, and was the instituting of a proceeding under a colonial act of 1691 through which the defendant obtained the fee to the forty feet; that the city became vested with the fee of the five feet appropriated in widening the street upon its northerly side by virtue of the authorizing statute of 1784.

The Special Term by its findings of fact and conclusions of law sustained the assertions of the plaintiffs. The Appellate Division, by the findings of fact as determined by it, and legal conclusions based upon them sustained the assertions of the defendant, and reversed any finding of fact made by the Special Term inconsistent with the findings made by it. In case the new findings of fact made by the Appellate Division have support in the evidence, we must, inasmuch as its legal conclusions are

upheld by the facts as found, affirm its decision. (*Union Trust Co. of Rochester* v. *Oliver*, 214 N. Y. 517, 522.)

We take up first the question, did the executory right in the Dutch sovereignty of being revested with the fee of lands as and when devoted to a street pass to the British sovereignty. It is neither necessary nor useful to attempt to determine or discuss whether the title of the British Crown to the territory of New Netherlands arose from discovery or conquest, or the cognate question whether the civil law was in force in the province *de jure* or merely *de facto*. "The claim of the Dutch was always contested by the English; not because they questioned the title given by discovery, but because they insisted on being themselves the rightful claimants under that title. Their pretensions were finally decided by the sword." (*Johnson* v. *M'Intosh*, 8 Wheat. 543, 576.) Historical research has not weakened the accuracy of the statement of Chief Justice MARSHALL. We assume, for the purposes of this case, that at the time of the execution and delivery of the ground brief to Damen in 1644 the Roman-Dutch law was in force in New Netherlands, that the grant by the ground brief was with reference to it and the correlative rights of the Dutch government and the grantee in relation to the grant were controlled by it, and that the grantee was vested with the fee subject to such limitations or servitudes as it and the ground brief affixed.

The Roman-Dutch law prevailed in the New Netherlands at the time of the sovereign grant to Damen. The Roman or civil law was its basis, but the government of the United Netherlands had through their enactments and customs incorporated in it provisions of their own. A rule of it was that every sovereign grant was subject to the revesting in the sovereignty of the absolute title to any part of the granted lands which became a public highway. (*Dunham* v. *Williams*, 37 N. Y. 251.) By virtue of it, the Dutch sovereignty from the time of the grant to the time it withdrew from and surrendered to Great

Britain the New Netherlands, would have become, as the representative of the people within its jurisdiction, the owner of the land of Cortlandt street, if appropriated for the street within that time. Throughout that period the title of Damen and of his successors was subject to such regal prerogative. It was a prerogative, however, which the Roman-Dutch law affixed to the Dutch sovereignty, which depended upon and which was enforceable only through that law. The common law of England knew naught of it, had no recognition for it or no remedy through which it might be grasped or enforced. The common law of England ruled, generally speaking, that, apart from any statutory provisions, the owner of the land adjoining a highway, or the lord of the manor, is owner also of the soil of one-half of the highway and the owner of the soil of a highway " has right to all above and underground, except only the right of passage for the King and his people," and may exercise all rights of ownership not inconsistent with the public right of passage. (*Goodtitle* v. *Alker*, 1 Burrow, 133; *Vestry of St. Mary, Newington,* v. *Jacobs,* L. R. [7 Q. B.] 47.) The executory prerogatives, privileges and rights, which by virtue of the Roman-Dutch law inhered in the Dutch sovereignty and which were foreign to the British sovereignty and its common law, did not pass, under the capitulation articles and treaties, to the British Crown or its representative, the Duke of York. The sovereignty of the Dutch was not merged in that of Great Britain. It withdrew from and became extinct in the territory of New Netherlands. It surrendered to the British Crown the public territorial possessions and estate. It did not transfer to the British Crown the Roman-Dutch law or the rights incorporate in the government of the Dutch by virtue of that law to seize, sequestrate or escheat any part of or interest in the lands granted by it. The reign of the Roman-Dutch law expired in New Netherlands (except as left applicable by the capitulation articles and treaties

to the private rights of the Dutch inhabitants) and with it expired the servitude, dependent upon and enforceable only through it, in the lands granted to Damen.    Executory sovereign rights springing from that law and enforceable only through it ceased to exist as to the surrendered territory and the British Crown had such prerogatives or rights in relation to it as the common law of England, modified, perhaps, by the stipulations of the surrender, gave it.    The property right in the Dutch government to a reversion of the title to so much of the lands granted to Damen as became a public street or highway was not a property right in the realm of the common law of England.    The common law did not recognize nor grasp nor uphold it.    The British Crown had not the right to assert a title to Cortlandt street, even as it obviously would not have had the right, to assert title to the lands granted to Damen through sequestration or escheat for a cause justifying under the Roman-Dutch law, but unknown to the English law.    (*Chicago, R. I. & Pac. Ry. Co.* v. *McGlinn*, 114 U. S. 542, 546.)    Such conclusion is not inconsistent with our decision in *Dunham* v. *Williams* (37 N. Y. 251, 253) or our views in other cases harmonizing with that decision.    In *Dunham* v. *Williams*, and in those other cases, the street or highway under consideration was laid out prior to 1664, as we have in each case expressly and carefully stated.    The executory sovereign right had, therefore, through the rule of the Roman-Dutch law, become executed and ripened into an absolute title and property.    That law had exhausted its office and had created that which the common law recognized as property. The Dutch government owned the land of the street or highway as it owned the vacant or ungranted lands of the province — an ownership and a property cognizable and regulated by the common law of England.    The ownership of the Dutch government in the land of a street or highway was the same as it would have been had its grantee or a successor in his title conveyed to it those lands.    Thus in

11

*Dunham* v. *Williams* we said: "The highway having been laid out long prior to the capitulation, the title of the government to the roadbed was absolute." In *Kane* v. *N. Y. Elev. R. R. Co.* (125 N. Y. 164) the fact was the same. In *Paige* v. *Schenectady Railway Co.* (178 N. Y. 102, 110) the defendant claimed that Washington avenue was a Dutch street and the title to it, therefore, in the public. We denied the claim, and said: "Obviously when Washington avenue became a public highway, the colony of New York was governed by the English law, under which the sovereign did not own the fee to the streets or highways, but only an easement upon the land over which they extended. Under the common law of England, the title to the land in a street or highway was not in the King, but in the lord of the manor, subject only to the easement of the public to a way over it." We conclude that the fee of the lands as and when devoted to the street did not pass to the British Crown.

We take up next the finding of the Appellate Division that under the declaration and petition of 1733 the predecessors of the defendant here took the necessary proceedings, under the colonial act of 1691, to lay out Cortlandt street as a public highway and that thereunder it acquired the fee of the forty feet.

The finding is and must be based, under the record, exclusively upon the contents of the declaration and petition and the language of the act. The contents of the declaration and petition and the granting of the petition have already been stated. The colonial act (Laws of 1691, chapter 18) in effect recited that it was necessary for traffic and commerce "that buildings streets lanes wharfs docks and alleys" be regulated with uniformity for public accommodation, and "that all impediments and Obstructions that may retard so necessary a work may be removed," and enacted that the municipal authorities might at their pleasure appoint supervisors of those public conveniences to act according to such rules

as they should establish, and might obstruct any building that would narrow a street, and if in the laying out for the future of any such convenience "they doe take any persons Grounds they are to give notice to the Owners or Partyes interested in the ground to be so taken," and may treat and agree with the owners or parties "to the end that reasonable satisfaction may be given for all such ground as shall be taken and employed for the uses aforesaid," or in default of agreeing may cause the impaneling of a jury to assess "such Damages and recompense as they shall judge fit to be awarded to the owners and others interested according to their severall and respective Interests and Estates Of any such ground or any part thereof for their respective interests and Estates in the same as by the said Mayor Aldermen and Common Council shall be adjudged fitt to be converted to the purposes aforesaid." The language of the act does not indicate or suggest that the declaration and petition had any relation to it. It clearly contemplates a proceeding *in invitum* in which the land to be appropriated for the public use was to be taken, not accepted as petitioned by its owners, and was to be paid for pursuant to an amicable agreement between them and the municipality, or in default of such agreement, to an assessment by the jury. The contents of the declaration and petition do not indicate or suggest that it has any relation to the act. The land described by it is, in form, dedicated to the public for the purposes of a street through the declaration and petition and the order or resolution of the common council. In form, a street is created by dedication. In contravention of such conclusion, it is asserted that the common law with respect to dedication had not in 1733 been developed. The assertion is unsupported by and is contrary to judicial authority and the natural conclusions authorized by the history of the common law. The easement of a private right of way was frequently created under the common law as early as the fourteenth century. "The most

elaborate and carefully worded of the private documents
which have come down to us are those which create or
regulate pasture rights and rights of way." (2 Pollock &
Maitland, History of English Law, p. 144.) It is a clear
and near step from a right of way to an individual to a
right of way to the public. In *Post* v. *Pearsall* (22 Wend.
425, 433) Chancellor WALWORTH stated: "Although
at the time of the publication of the laws of William the
Conqueror there were but four great roads in England
called the King's highways, yet no one can doubt that
there were, even at that time, innumerable throughfares,
and many squares and open spaces, which had been dedi-
cated to the use of the people at large, for passages and
promenades; and the number since that time has proba-
bly increased an hundred fold. The law of *dedication,*
therefore, which was applicable to thoroughfares, was
properly applicable to market places and promenades,
although they were not highways in the ordinary sense
of the term." This general statement has a strong sup-
port in the authoritative statement: " Most highways
have, or are deemed to have, originated from the owner's
dedication of his land to the public for the purposes of
passage and acceptance by the public of his gift, evidenced
by their user of the way." (16 Halsbury's Laws of Eng-
land, p. 12.) Judicial authority upon the question is
not lacking. In *Mayor, etc.; of New Orleans* v. *United
States* (10 Peters, 662) it was held that land was dedi-
cated to the public use in 1724, and the court said:
" That property may be dedicated to public use, is a well
established principle of the common law. It is founded
in public convenience, and has been sanctioned by the
experience of ages. * * * The original dedication is
proved by the maps in evidence, and by a public use of more
than a century. These facts are conclusive." (Pp. 712–
717.) In 1713 an English court recognized the principle
of dedication in the following opinion: "If a vill be
erected, and a way laid out to it, if there be no other way

but *that* to the vill, it is not material *quo animo* it was laid out, it shall be deemed a *public way.*" (*The Queen* v. *Inhabitants of Hornfey,* 10 Modern, 150.) In 1732 it was likewise recognized in the two decisions in *Rex* v. *Hudson* (2 Strange, 909) and *Lade* v. *Shepherd* (2 Strange, 1004), in each of which the alleged dedication was many years prior to the rendering of the decision. We think the declaration and petition and the resolution or order of the common council conclusively established the dedication of the forty feet to the public for the purposes of a public street. By the common law, in the act of dedication, the fee of the soil remained in the owners but the use of the street was vested in the public. The owners parted with the use involved in the purposes of a street only. (*Barclay* v. *Howell's Lessee,* 6 Peters, 498; *City of Cincinnati* v. *Lessee of White,* 6 Peters, 431.) Our conclusion is that the defendant has not at any time held the fee to the original forty feet of the street and that the finding of the Appellate Division in relation thereto is not supported by the evidence.

We take up next the finding of the Appellate Division: "That when the common council determined to lower the grade of Cortlandt street and to extend its width five feet on either side," pursuant to chapter 56 of the Laws of 1784, "the fee to the widened part of the street vested in the city of New York." This finding has not any support in the evidence. The statute of 1784 recited, in effect, the destruction by fires " during the war " of a considerable part of the city and that streets in such destroyed parts might be beneficially altered, and authorized, in effect, the city to appoint commissioners for the purpose of laying out the streets in such parts of the city under prescribed restrictions with the provision that where any owner deemed his lot injured he might apply to the city " to have the injury or damage so supposed to have been suffered, ascertained by appraisement " and appraisers " shall determine upon a full and equitable consideration

and estimate of all the circumstances attending the alteration in the streets, as aforesaid, whether such lot or lots has or have been decreased or advanced in value by such alterations and to what amount," and contemplated payment to the owner of his damage or by him for the increased value. A proceeding under this statute effected the widening of the street. It does not appear from any finding or the proceeding as described that a fee was taken or sought. The statute, obviously, did not prescribe or require the taking of the fee to the land appropriated for the widening. An easement fulfilled its intendment and purposes and constituted the interest taken, because when the language and intent of a statute do not otherwise require, the fee to land appropriated for a public use will remain in the owner. (*Mott* v. *Eno,* 181 N. Y. 346; *Bradley* v. *Crane,* 201 N. Y. 14.) Our conclusion is that the defendant has not at any time held the fee to the land used in widening the street.

We take up now a question to which we have not as yet referred. The Special Term found as facts, the extent of the occupied vault space; the demand of the defendant that the plaintiffs pay for the use of such space and take out a permit for its use; that the ordinances of the defendant, adopted in 1906 and existing at the time of the demand, forbade, under a penalty, the construction of a vault in a street without the written permission of the borough president having jurisdiction, and payment to him, after obtaining the permission, of "such sum as he shall certify in the said permission to be a just compensation to the city for such privilege, calculated at the rate of not less than 30 cents, nor more than $2 per foot for each square foot of ground mentioned (in the application) as required for such vault," and that no permit to use any portion of said space was ever applied for by the plaintiffs or their predecessors in title. It held as conclusions of law that the plaintiffs had not the right to construct or maintain the vaults

without obtaining the permit from the defendant, and the defendant had not the right to require the plaintiffs as a condition precedent to the use of any part of the said vault space to pay to it compensation fixed in the ordinance for the privilege of using said space. The judgment enjoined the defendant "from exacting from the plaintiffs the compensation fixed in the ordinance passed in the year 1906, and from interfering in any manner with plaintiffs' use of said vaults by reason of plaintiffs' failure or refusal to pay such compensation." The reasoning of the Special Term as expressed in the opinion was: The ordinance imposed a compensation based upon the number of square feet contained in the vault space and hence imposed not a mere license fee incident to the power to investigate the application and regulate the use of the street, but a tax measured in amount by the rental value of the vault; the charter of the defendant conferred upon the board of aldermen power to regulate merely, which does not include the power to tax. The Appellate Division made the finding of fact (*Ryan* v. *Franklin*, 199 N. Y. 347): "That no proof was adduced by the plaintiffs which tended to show that the rate of compensation which was prescribed by the ordinances for a vault permit was either excessive or unreasonable or in the nature of a tax or an assessment or a rental for the use of the land," and the conclusion of law: "That even assuming that the plaintiffs are the owners of the bed of Cortlandt street, still they have not the right to construct vaults thereunder without the permission of the municipal authorities. And as a condition of granting such permission, the municipal authorities are entitled to impose such terms and conditions as they may see fit to indemnify the city against the expenses which it would be subjected to in performing its duty of supervision and inspection and maintenance and repair."

There is not in the record any evidence supporting the finding of the Special Term that the defendant demanded

of the plaintiffs that they pay for and take out a permit for the use of the space or land occupied by the vaults, or the conclusion that the ordinances provided or intended that the plaintiffs should pay a tax upon or for such space. The language of the ordinances, upon which ultimately the finding is based, does not support the finding or conclusion. It expresses that the privilege applied and to be compensated for is that of constructing a vault in the street. That privilege has not any relation to the ownership or a renting of the land of the street or the use of the fee. It is a requisite preliminary to the construction of the vault, because the land constituting the street is subject to all the public uses, servitudes and appropriations essential to or consistent with its status as a street, and, in the interest of public safety, convenience, security and comfort, is, within all legitimate street uses, by statutory grant, under the control, regulation and disposition of the public authorities, whose right to exact a payment or fee, in the process of regulation, for a permission or privilege of exercising in it a private possession or advantage, consistent with the public uses, is undoubted. (*Jorgensen* v. *Squires,* 144 N. Y. 280; *City of Buffalo* v. *Stevenson,* 207 N. Y. 258; *Deshong* v. *City of New York,* 176 N. Y. 475; *Lincoln Safe Deposit Co.* v. *City of New York,* 210 N. Y. 34; *City of New York* v. *Rice,* 198 N. Y. 124.) This right exists as to the owner of the land contiguous to the land of the street, irrespective of the ownership of the fee of the latter, because it is an element in the authorized regulation and supervision of the street.

The provisions of the ordinances do not contain any evidence that the payment required from the applicant for the permission to construct a vault is a tax and not a fee for the permission. They require him to state in his written application "the number of square feet of ground which is required for the same, and the intended length and width of the same" and to pay as a just compensation for the privilege a sum "calculated at the rate of

not less than 30 cents, nor more than $2 per foot for each square foot of ground mentioned as required for such vault * * *." We cannot discern in the fact that the licensing officer is required, in exercising his discretion as to the amount, to make the basis of his computation the number of square feet of the space to be occupied, support for the legal conclusion that the payment is a tax or assessment for revenue. It does not tend to prove that a computation so based would produce an unreasonable charge or fee for the expenses of the defendant resulting from the ascertainment as to whether or not the permission should be granted as requested and the regulation, supervision and inspection incident to the construction and maintenance of the vault. The language carries no evidence that the ordinances apply only to vaults constructed in streets, the fee of which is in the defendant, or that the compensation is a rental.

The appellants take before us the further ground that the ordinances are unauthorized and unlawful because they apply alike to all streets irrespective of ownership, and therein refuse to recognize the superior rights of the individuals owning the fee of a street. Inasmuch as this ground assumes that the compensation required by them is a rental, what we have already said makes further consideration of it unnecessary.

For the reasons stated, the judgment should be affirmed, with costs.

WILLARD BARTLETT, Ch. J., HISCOCK, CHASE, HOGAN and CARDOZO, JJ., concur.

Judgment affirmed.