# Arronson et al. v. City of Philadelphia et al.

*Simon Pearl* and *Henry Arronson*, for plaintiff.

*David J. Smyth*, city solicitor, and *Thomas B. K. Ringe* and *Samuel Feldman*, assistant city solicitors, for defendant.

STERN, P. J., April 27, 1932.—This is a bill in equity, praying for an injunction against the enforcement of a certain ordinance of the City of Philadelphia which provides for the inspection and licensing of certain bridges, vaults and tunnels. Upon bill, answer and proofs the court makes the following

## Findings of fact.

1. The plaintiff is the owner in fee simple of a piece of ground in the City of Philadelphia known as 339 South Street, having obtained title thereto by deed recorded at Philadelphia in Deed Book J. V., No. 94, page 505, &c.; also of a piece of ground known as 341 South Street, having obtained title thereto by deed recorded at Philadelphia in Deed Book J. V., No. 326, page 313, &c.; also of a piece of ground known as the southwest corner of Fifth and Federal Streets, having obtained title thereto by deed recorded at Philadelphia in Deed Book J. M. H., No. 3135, page 234, &c.

2. The intervening plaintiff, Ketterlinus Lithographic Manufacturing Company, owns and occupies premises known as 409, 411 and 413 Arch Street, in the City of Philadelphia, and is also the lessee and occupant of premises known as 401, 403, 405 and 407 Arch Street, under a lease with the owner of said premises, whereby said intervening plaintiff is bound to pay as rent all taxes and municipal charges whatsoever.

3. The defendant City of Philadelphia is a municipal corporation of the first class of the Commonwealth of Pennsylvania, and the other defendants are officials of the said city as respectively specified in the caption of the case.

4. Each of the plaintiff's properties above mentioned contains a vault or cellar for the storage of coal, located under or partially under the highways which abut said properties, said vaults having been constructed at the respective times when the buildings erected on said premises were built, which was more than thirty years prior to the date when this action was commenced.

5. There are five vaults located under or partially under the highways which abut the intervening plaintiff's premises above mentioned, which vaults also have been in existence for a long number of years.

6. On December 16, 1931, the Mayor of the City of Philadelphia approved an ordinance which had been duly passed by the city council and which was entitled:

"To provide for the inspection, licensing and regulation of certain structures on, over or under any public street or highway; imposing the duty of such inspection upon the Bureau of Highways in the Department of Public Works; fixing license fees; and providing penalties for the violation thereof."

Said ordinance provided in substance that from and after January 1, 1932, it should be the duty of the Bureau of Highways, Department of Public Works, to inspect at least semi-annually bridges, vaults and tunnels which were upon, over or under the public highways, in order to make sure that these structures were maintained in a safe condition. The ordinance further provided that all persons maintaining such structures should pay a license fee therefor of $50 per year for each of said structures, upon the payment of which charges licenses should be granted for the maintenance of the said structures for the calendar year. Applications for such licenses were to be made for the year 1932 up to and including February 1, 1932. Any persons maintaining any such structures without first obtaining a license therefor were, after ten days' notice given to them by the Bureau of Highways, to be subject to a penalty. Nothing in the ordinance was to apply to bridges, vaults and underground tunnels of public service companies. Structures required to be licensed were declared to be nuisances if maintained without such licenses, and, after ten days' notice from the Bureau of Highways, might be removed by said bureau without further notice at the expense of the persons maintaining the same. The ordinance provided that it should be effective on and after January 1, 1932.

The complete terms of the said ordinance are set forth in paragraph six of the plaintiff's bill of complaint, and are incorporated herein by reference thereto.

7. In pursuance of a resolution adopted by city council, the city controller submitted to council a statement, based upon information which he received from the Department of Public Works, of the estimated revenue that would be derived yearly under said ordinance, said statement indicating that there were 4000 vaults, 50 bridges and 50 tunnels, which, at $50 each, made an estimated yearly revenue of $205,000.

8. There are on, over or under the public highways of the city approximately 3700 vaults and 100 bridges and tunnels maintained by private persons, and, therefore, the yearly revenue which should be obtained by the city under the provisions of said ordinance is $190,000.

9. In making one inspection of each 700 vaults, bridges and tunnels in the city the Department of Public Works will have to maintain a field force costing from $850 to $1700; a permit office costing about $1463; there will

be general overhead expenses amounting to $300 to $500; special investigations and examinations by skilled engineers will be required costing approximately $1750. The maximum total cost of one inspection of each 700 vaults, bridges and tunnels will, therefore, be $5413. The second inspection will probably cost not more than one-third of the first inspection, or approximately $1804. The making of the two inspections each year as required by the ordinance will, therefore, cost the city, including overhead, approximately $7217 for each 700 vaults, bridges and tunnels, or the sum of $39,178 for the 3000 vaults, bridges and tunnels on, over or under the public highways of the city.

10. The likely revenue that will be obtained by the City of Philadelphia from the enforcement of said ordinance will be almost five times the likely expense as above stated.

11. Any reasonable cost of inspection and supervision, such as provided for in said ordinance, will scarcely exceed, at the highest possible estimate, one-fifth of the revenue provided for according to the terms of said ordinance.

12. The reasonable cost of inspection, licensing and regulation provided for in the ordinance will scarcely, if at all, exceed the sum of $10 per year for each structure inspected, licensed and regulated.

13. The amount of the fees imposed by said ordinance is purely arbitrary and has no relation to or connection with the cost to the city of enforcing it and of inspecting, licensing and regulating the structures in question.

14. Even if some or many of the vaults now existing are filled in (which is purely problematical), the ratio between the revenue derived and the cost of inspection per vault will not be materially changed, since the cost of inspection, licensing and regulation will diminish in substantially the same proportion in which such filling in occurs.

15. The fees or charges imposed by said ordinance are excessive and unreasonable.

## Discussion.

The only issue of fact in the case is as to the probable net return to the city from the operation of the ordinance. On this question the chancellor adopted substantially the figures presented by the city as the likely cost of the inspection and regulation provided for in the ordinance. The city contended that the cost of the original inspection of 700 vaults would be $5413, and of a second inspection $2707. The chancellor adopted the first of these estimates, but reduced the second to $1804. The result is that, whereas the city contended that the entire annual cost would be approximately $43,307, the chancellor found that such cost would be approximately $39,178; the difference is obviously negligible, and as a matter of fact it is believed that the cost will be much less than the estimates furnished by the city's witness. As far as the income is concerned, it is agreed that there are 3800 structures covered by the ordinance, which would, therefore, bring in a gross annual return of $190,000. It is true that the city's witness testified that some of the property owners would probably fill in their vaults and thus remove them from the operation of the ordinance. His statement, however, that this might be done by two-thirds of the property owners was obviously nothing but a wild guess. It might just as well be predicted that all the property owners would fill in their vaults, in which case there would be no revenue whatever. It is not really of importance to estimate the extent to which such filling in of vaults will occur, because the necessity of inspection will disappear with the disappearance of the vault; therefore, the same process which reduces the revenue would proportionately reduce the cost, and the same ratio will remain

between income and expense. That ratio, as found by the chancellor on the figures above set forth, is almost five to one; that is to say, the city is imposing a charge of $50 per vault, whereas the cost of inspection, licensing and regulation provided for in the ordinance will not in any reasonable likelihood exceed $10 per vault.

The question of law, therefore, arises whether such a charge can be sustained as a valid exercise of power on the part of the municipality.

It is clear that the ordinance cannot be upheld on the theory that the charge which it imposes is an annual rent. In Pennsylvania it is well established that, generally speaking, the fee simple title of property abutting on a public street extends to the center thereof, and the public has merely an easement in the highway: Scranton v. Peoples Coal Co., 256 Pa. 332, 335. See, in general, 29 C. J. 540, section 257; 44 C. J. 915, section 3666.

Obviously, therefore, the municipality cannot charge rent for property belonging to the person on whom it seeks to impose such a charge: Tacoma Safe Deposit Co. v. Chicago, 247 Ill. 192; Sears v. Chicago, 247 Ill. 204.

Neither can the ordinance be sustained on the theory that it imposes a tax. It is elementary that municipal corporations have no power to pass ordinances for the purpose of raising revenue except in so far as such power is expressly or by necessary implication granted to them in their charters or in the statutes of the state: Titusville v. Gahan, 34 Pa. Superior Ct. 613, 621; Kittanning Borough v. Kittanning Consolidated Natural Gas Co., 26 Pa. Superior Ct. 355, 361; 37 C. J. 179, section 20; 17 R. C. L. 525, section 45.

What the defendant contends is that the city has full power of control and regulation of its streets, both over and under the ground, that because of such power it may prohibit the building of vaults or overhead structures altogether, that it may, therefore, grant such privileges on whatever condition it chooses to impose, and that the condition thus exacted may consist of the payment of a charge or fee.

True it is that the city has the right to regulate the use of its streets. This is given to it by the Act of April 16, 1838, P. L. 626, section 3; the Act of June 25, 1919, P. L. 581, article VI, section 3; and the Act of May 1, 1929, P. L. 1063, part IX, chapter 48, sections 4802 and 4804, and accordingly it has been held that the city may regulate or even entirely forbid the erection of structures over or under the streets: Reimer's Appeal, 100 Pa. 182; Lenon v. Porter, 65 Pa. Superior Ct. 94; Snively v. Washington Township, 218 Pa. 249; Walnut and Quince Street Corp. v. Mills, 303 Pa. 25.

It does not, however, follow that, because the city has a right to forbid the construction of vaults under the highway, it can grant permission to the abutting property owner to erect them provided he pays a sum of money for the privilege or an annual sum for the right to maintain them. There are numerous instances in the law where a governmental body may forbid certain acts entirely, and yet may not allow them to be performed on whatever condition it may see fit to impose; it cannot grant or withhold rights on a condition which it has no authority to exact, or in furtherance of objects which are beyond its power. A familiar illustration of this principle is that a state is not obliged to allow a foreign corporation to register to do business within the state, but it cannot grant its consent to such registration upon condition that the foreign corporation shall agree not to attempt to remove to the federal courts suits which may thereafter be brought against it in the state courts. The only reason why the city is given control over its streets is that it may provide for the public safety, health and comfort in the use of the streets. It is, therefore, vested with police power over the public

highways, and in the exercise of this police power it may, as above stated, regulate, and no doubt forbid entirely, the construction of vaults or other structures on or under the bed of the streets. But it cannot sell its police power; it cannot forego the exercise of its police power for a price. It can regulate or forbid a structure which it thinks may be dangerous, harmful or otherwise undesirable, but it cannot charge a citizen for the privilege of erecting or maintaining such a structure. It cannot make the exercise of its police power a subterfuge for raising revenue for the city treasury. For example, the city might, if there were some good reason for thinking that it was dangerous to have automobiles driven along a certain street, entirely prohibit the use of such street for automobile traffic, but merely because it has such right it could not justify an ordinance providing that every automobile driven along such street should pay a stipulated charge or fee.

The defendant has called attention to the familiar case of municipal concessions to public service companies, where the use of its highways is granted on such conditions as the city may choose to impose. There is, however, no analogy between such cases and the one here under consideration. A street railway company has no property right of any kind in the highways of the city which would enable it to use them without the city's consent. In giving its consent, what the city really does is to sell to the company a part of the city's easement in the highway. The public easement is in itself a property right and some of it is conveyed to the street railway company when the latter is given permission to lay tracks and run cars; such a privilege may be sold, just as a private property owner may sell rights or privileges in his property to other persons according to his pleasure. But in the case of the building of a vault by an abutting property owner, the city has no property right to sell to him, because he, and not the city, owns the fee of the ground in which the vault is constructed. It is true that if the construction of the vault interferes with the public easement, it must give way to such easement, and, as already stated, the city may doubtless forbid the erection of the vault in the exercise of its police power or because it may anticipate an interference with the public easement. But the city has no right to exact a tax from the property owner for not exercising a governmental power which should be exercised if required by the facts of the case, and cannot be exercised if not so required.

Counsel for the defendant has cited the case of Appleton v. New York, 219 N. Y. 150, as authority for the proposition that a municipality may make a charge merely for the privilege given to an abutting property owner of maintaining a vault under the highway. If that case so holds, it is not in harmony with the great weight of the authorities in other jurisdictions. It is to be pointed out, however, that the court laid stress upon the fact that the charge was in the nature of a fee for the purpose of regulation and that there was no evidence that it would produce an income which would be in excess of the expenses of the city in connection with the licensing, regulation and inspection incident to the construction and maintenance of the vault. This observation would seem to bring the case into harmony with the general principle of the inspection fee cases hereinafter referred to.

Eliminating, therefore, any possible justification for the ordinance here in question as a rent charge, or a tax measure, or the imposition by the municipality of a condition for the granting of a privilege in connection with the regulation of the public highways, we come to the final theory upon which such justification is claimed, and that is that it is an inspection fee, intended merely to reimburse the city for the cost of inspecting, regulating and licens-

ing the structures as provided in the ordinance. The doctrine is well established that while, as above pointed out, the city cannot exact a payment as the condition on which it will or will not exercise its police power, it can, under certain circumstances, charge the actual or likely cost of an exercise of the police power upon those who make such exercise of the police power necessary. It is, therefore, generally held, that where, in the exercise of such power, a municipality provides for the licensing and inspection of certain occupations or of certain structures, it has the right to make the persons concerned therein pay the reasonable cost thereof. Such a charge is not regarded as in any sense a revenue-producing measure or as the imposition of a tax. It is merely making the person who causes the expense pay for it. There are, however, well-established rules of law governing the imposition of such fees. The fee must be reasonable; that is, it must be intended and calculated to produce, and must in fact produce, a return not greater than the likely expense to the municipal authorities incident to the regulation and inspection to which it applies. The form in which the charge is laid or the name by which it is designated in the ordinance does not conclusively determine its character. It is for the court to determine the true nature of the alleged fee and to strike it down if in reality it is a tax imposed under the guise of a police regulation: Pittsburgh Rys. Co. v. Pittsburgh, 211 Pa. 479; Kittanning Borough v. Kittanning Consolidated Natural Gas Co., 26 Pa. Superior Ct. 355, 219 Pa. 250; In re Delaware and Atlantic Telegraph and Telephone Co., 224 Pa. 55; Wisconsin Telephone Co. v. Milwaukee, 1 L. R. A. (N. S.) 581; Postal Telegraph Cable Co. v. Taylor, 192 U. S. 64; 17 R. C. L. 543, 544, section 59.

It is true that a reasonable discretion is allowed to the municipal authorities, because the exact cost would probably not be capable of ascertainment in advance, and the court cannot interfere unless there has been such an obvious abuse of discretion as to indicate that the real purpose of the ordinance is not merely to recover the cost of enforcing the ordinance, but to procure a revenue therefrom: Kittanning Borough v. Armstrong Water Co., 35 Pa. Superior Ct. 174; Gettysburg v. Gettysburg Transit Co., 36 Pa. Superior Ct. 598.

In the present case the chancellor has arrived at the conclusion that the charge fixed by the ordinance is so clearly unreasonable as to make it impossible to sustain it as an inspection fee. It has been found as a fact that the proportion between income and cost will be approximately five to one, and even that finding is based upon what would seem to be an extreme estimate of the cost to the city. Making every allowance, therefore, in favor of the city, it would, nevertheless, seem impossible to conclude other than that the charge established by the ordinance bears no relation to the cost of enforcing its provisions, that it was really designed to provide revenue for the city, and that it will provide such revenue if allowed to stand. In coming to this conclusion, the chancellor has not been influenced by the public and press discussion which preceded and attended the passage of the ordinance in council, to the effect that the ordinance sought a new object of municipal taxation, but solely by the facts and figures which speak for themselves and which characterize the purpose and effect of the ordinance.

It may be added in passing that the fee imposed by the ordinance of September 17, 1888, section 2, page 266, to be paid at the time of the original construction of a vault under the streets of the city, should also be governed by the same principles as those here discussed. It is a proper duty of the city to see to it that when a vault is constructed under the highway it is

safely built and in conformity with the municipal ordinances governing its construction, as, for example, that of March 31, 1902, section 1, page 72, which provides that the vault must be at least four feet below the established grade of the sidewalks. Therefore, the city was justified in charging a fee to cover the cost in connection with the supervision of the original construction of the vault, but the reasonableness of the charge must be tested by the same rules as in the present case. However, the ordinances dealing with the original construction of vaults are not involved in the present case, and the reasonableness of the fee imposed by them has never been questioned.

The plaintiffs have attacked the validity of the present ordinance on other grounds than those heretofore considered. For example, they object to the discrimination it makes in favor of bridges, vaults and underground tunnels of public service companies, and, indeed, however reasonable the discrimination might appear to be in the case of underground conduits, subways, etc., it is difficult to understand how such a discrimination is tenable where a vault is maintained under the sidewalk in front of an ordinary building owned by a public service company. The plaintiffs also contend that the ordinance is invalid in providing that if a license is not obtained for the maintenance of the vault or other structure, it may, after ten days' notice, be removed by the city. It is argued that if the structure in itself does not constitute a nuisance, it cannot become one merely because a fee demanded for its maintenance is not paid; that a municipal corporation cannot make something a nuisance merely by legislative fiat, and then prohibit it, if it is not in fact an infringement upon the public safety (Bryan v. City of Chester, 212 Pa. 259; Manorville Borough v. Flenner, 286 Pa. 103; 43 C. J. 402, section 520); and that, while the failure to pay a tax may be followed by the liening and sale of the property in execution, such failure cannot justify a destruction of the property. It is argued that so to remove or destroy the structure would amount to a deprivation of property without due process of law, especially as the ordinance does not provide for a judicial hearing, but allows a summary abatement of the structure merely upon notice being given by the city. It is not, however, deemed necessary to discuss these additional matters. The chancellor's opinion being that the only theory which would legally justify the ordinance is as an inspection fee, but that as an inspection fee it is unreasonable and excessive, and apparently intended to produce and in fact producing substantial revenue for the city instead of merely covering the cost of enforcement of the ordinance, the validity of the ordinance cannot be sustained.

### Conclusions of law.

1. The general rule is that the public acquires only an easement in highways, the fee of the land remaining in the owner subject to the easement. It is presumed, in the absence of evidence to the contrary, that the title to the fee is in the abutting land owner and that his title extends to the center of the highway.

2. Where the abutting owner owns the fee to the center of the highway, he cannot be required to pay rent for the use of the surface or subsurface. He cannot be made to pay the city for the privilege of using his own property in a way that does not interfere with the enjoyment of the public easement.

3. The City of Philadelphia has been given, by various legislative enactments, the power to regulate the use of its streets, and in the exercise of such power it may deny even to abutting owners the right to build permanent structures on or over the highway; but it cannot as to such abutting owners grant or withhold such right on conditions which it has no authority otherwise to exact or in furtherance of objects which are beyond its powers. Under

the guise of regulating the use of its streets, it cannot raise revenue from abutting owners and in effect exercise over them a power of taxation which is not possessed by the municipality.

4. Municipal corporations have no jurisdiction to make laws or to exercise powers other than as expressly or impliedly permitted to them under their charters or the statutes of the state. A municipal corporation has no power to levy a tax unless such power is clearly conferred by the legislation of the state.

5. The City of Philadelphia has no power to levy an annual tax upon property owners for the privilege of maintaining vaults or other structures on or under the highways abutting their properties.

6. The maintenance of vaults beneath the sidewalks of streets does not in itself constitute a nuisance. Unless it threatens public safety it cannot be made a nuisance by councilmanic fiat. A municipality cannot declare a lawful use by the abutting owner of his own property to be a nuisance and then prohibit such use.

7. The declaration in the ordinance involved in the present case that unless the stipulated fees or charges are paid the vault or structure becomes a nuisance subject to abatement, constitutes an unwarranted invasion of private property rights. The city has the right to lien, and ultimately thereunder to sell, a property because of failure of the owner to pay fees, charges or taxes; but the city cannot, as a penalty for such failure, declare a condemnation of the property and order its destruction.

8. The enforcement of the ordinance under consideration would deprive persons who failed to comply with its provisions of their property without due process of law.

9. The City of Philadelphia has the right to provide for the inspection and regulation of vaults and other structures on, over or under the highways, and it has the right in connection therewith to impose upon the owners of such structures the cost of such inspection and regulation. The form, however, in which the charge is imposed, or the name by which it is designated, does not conclusively determine its character, and if in reality it is a tax and intended for the purpose of raising revenue, it cannot be sustained under the guise of a police regulation.

10. The fact that the element of public safety is to some extent involved in the subject matter of an ordinance does not prevent a court of equity from looking into the probable revenue to be derived from its enforcement and the cost of such enforcement in order to determine its true nature.

11. All that a municipality can charge with respect to inspection, licensing and regulation of occupations or structures is the reasonable cost of such inspection, licensing and regulation.

12. In the case of an inspection fee imposed in the exercise of the police power, the municipality is at liberty to make the fee large enough to cover any reasonably anticipated expense, and it need only exercise reasonable discretion in fixing the fee accordingly. An ordinance will not be declared void because of alleged unreasonableness of the fee charged unless such unreasonableness is so apparent as to demonstrate an abuse of discretion on the part of the municipal authority and to indicate that the real purpose of the charge is to raise revenue and not merely to pay the cost of inspection and regulation.

13. The fee or charge imposed by the ordinance under consideration in the present case is excessive and unreasonable, and bears no relation to any possible expense of inspection and regulation of the vaults and other structures with which the ordinance is concerned.

14. The ordinance under consideration is a revenue-producing and not a police measure, and the charge imposed by it, being in reality a tax intended for purposes of revenue, is not sustained by any legislative authority.

15. The plaintiff and intervening plaintiff are entitled to an injunction restraining the enforcement of the ordinance.

The court, therefore, enters the following

*Decree.*

And now, to wit, April 27, 1932, it is ordered, adjudged and decreed:

1. That the defendants, their and each of their officers, agents, attorneys and employees, be, and they hereby are enjoined and restrained from enforcing the provisions of the ordinance of the City of Philadelphia of December 16, 1931, set forth in the sixth paragraph of the plaintiff's bill of complaint.

2. That the said ordinance is invalid and void.

3. That the defendants, their and each of their officers, agents, attorneys and employees, be, and they hereby are enjoined and restrained from collecting from the plaintiff or the intervening plaintiff the fees or charges provided for in said ordinance, and from removing, damaging, destroying or in any way interfering with or preventing the maintenance of, the vaults located under or partially under the highways abutting on said plaintiffs' properties, because of any failure on the part of said plaintiffs or either of them to pay the fees or charges provided for in said ordinance.

4. That the defendant, the City of Philadelphia, shall pay the costs of these proceedings.

The prothonotary will enter this decree *nisi* and give notice of the same to the parties or their counsel, and if no exceptions are filed within ten days thereafter either party may present to the court a form of final decree then to be entered.